520 P.2d 495

**The STATE of Arizona, Appellee,**

v.

**James E. DRURY, Appellant.**

**No. 2599.**

Supreme Court of Arizona,
In Banc.

March 25, 1974.

Rehearing Denied April 23, 1974.

Gary K. Nelson, Atty. Gen., Phoenix by Howard L. Fell, Asst. Atty. Gen., Tucson, for appellee.

Lieberthal & Kashman by Howard A. Kashman, Tucson, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from a judgment of the court, sitting without a jury, finding the defendant James E. Drury guilty of second degree murder (§§ 13–451, 13–452 A.R.S.), and from a sentence of not less than thirty nor more than forty years (§ 13–453 A.R.S.) in the Arizona State Prison.

We are called upon to answer the following questions on appeal:

1. Was the defendant's waiver of a jury trial, based on the prosecutor's promise not to seek the death penalty, voluntarily and intelligently made when the death penalty was ruled unconstitutional by the United States Supreme Court shortly after the trial?

2. Was the defendant's ex-wife competent to testify?

3. Did the testimony of the defendant's ex-wife violate the defendant's marital privilege against disclosure of confidential communications?

4. Did the trial court err in finding that the defendant's inculpatory statement to the sheriff's deputies was voluntary and admissible in evidence?

5. Was the testimony of one Dr. Cleary concerning the defendant's sanity improperly allowed where the doctor's opinion was based in part on tests and conclusions of other experts?

6. Was the evidence sufficient to establish the corpus delicti?

7. Does the evidence support a conviction for second degree murder?

8. Is the sentence excessive?

The facts necessary for a determination of the issues before us are as follows. In March 1970, the defendant James Drury and his wife Joyce (Mrs. Barr at the time of trial) were convicted in Freestone County, Texas, for theft and forgery, respectively. They were given "bench paroles" on condition that they leave Texas and not return to that State for a period of two years. In April 1970, defendant, his wife and their children arrived in Tucson, Arizona, and stayed at the Salvation Army Hospitality House in that city until the defendant secured a job and was able to move his family into a trailer. While at the Hospitality House the Drury's made the acquaintance of one Hoskins Foster.

On 10 May 1970, between 10:00 and 11:00 a.m., Hoskins Foster drove to the Drury residence, got the defendant out of bed, and the two started drinking beer. The defendant and Foster left the trailer for a short time, and when they returned, continued to drink. About 2:00 p.m. the defendant told his wife to go to his place of employment to pick up a check. When she returned about 1½ hours later she found the beaten and bloody body of Foster lying on a hide-away bed. The body was stripped of clothing and covered with a sheet, a blanket, and a towel. At her husband's direction, Mrs. Drury placed the body into a sleeping bag, dragged it out of the trailer and placed it into the trunk of Foster's car. The defendant then loaded his family into the car and started driving on Interstate 10 in the direction of Phoenix. Enroute the defendant stopped the car and dropped Foster's body in the desert near the Ina Road exit off Interstate 10. He proceeded on to Phoenix where he was stopped and arrested for driving while intoxicated and for driving without a valid license.

On the following day, 11 May 1970, the body of Hoskins Foster was discovered by a passing motorist. An autopsy was performed and the cause of death determined to be suffocation due to aspiration of vomitus. Foster's blood alcohol level was fixed at .27.

Through its investigation authorities in Pima County came to suspect Drury in the beating of Foster. On 20 May 1970, deputies from the Pima County Sheriff's Department traveled to Phoenix to question Drury, who had been incarcerated in the Maricopa County Jail since his arrest ten days earlier. The defendant was advised of his Miranda rights after he answered a few preliminary questions concerning his age, schooling, etc. He waived his rights and then responded to further questions by the deputies. He stated that he and Foster had been drinking in the morning of 10 May, that after several hours of drinking a fight ensued, and that he had beaten Foster with a 2x3 board. He maintained, however, that Foster was still alive after the beating and that he stripped him of his clothes and placed him in the desert only to prevent him from going to the police.

The defendant was transported to Tucson, and on the following day, 21 May 1970, he was examined by Dr. Cutts, a psychiatrist, at the request of the Pima County Attorney's Office. At the trial, Dr. Cutts testified on the defendant's behalf both as to the insanity issue and the defendant's mental ability to understand the meaning and substance of his Miranda rights for the purpose of waiver. Another psychiatrist, Dr. Jones, who examined Drury on 27 June 1970 gave similar testimony on behalf of the defense.

On 16 June 1970, after a preliminary hearing, the defendant was held to answer on an open charge of murder. The defendant sought a writ of habeas corpus in the Superior Court, contesting the magistrate's finding of probable cause to believe that the beating of Foster resulted in his death. The petition was denied, and the defendant appealed. The Court of Appeals

reversed, Drury v. Burr, 13 Ariz.App. 164, 474 P.2d 1016 (1970), and this court granted a petition for review, set aside the decision of the Court of Appeals, and affirmed the order of the Superior Court. Drury v. Burr, 107 Ariz. 124, 484 P.2d 539 (1971). The defendant then sought relief in the federal courts. The District Court denied relief, and the Ninth Circuit Court of Appeals affirmed the District Court's judgment, holding that the appeal was premature. Drury v. Cox, 457 F.2d 764 (9th Cir. 1972). While awaiting the outcome of his appeals, the defendant was three times transferred from jail and committed to the Arizona State Hospital. He was committed on emergency certification on 2 June 1971, and released a short time thereafter. However, during that same month he was again committed and on 23 June 1971 he was declared incompetent to stand trial. On 4 August 1971, the hospital officials declared that his competency was restored, but on 27 October 1971 the defendant was recommitted to the Hospital and spent four months in maximum security. It was during this latter commitment that defendant's wife secured a divorce decree in Harris County, Texas.

Commencing on 5 June 1972, after he was declared competent, the defendant went to trial before the court without a jury. Defendant's ex-wife, Mrs. Joyce Barr, testified against him, and he was adjudged guilty of second degree murder and sentenced to from thirty to forty years.

## WAS THE DEFENDANT'S WAIVER OF A JURY TRIAL KNOWING AND VOUNTARY?

■ The defendant waived his right to a jury trial on the prosecutor's promise not to seek the death penalty. A short time after defendant's conviction the United States Supreme Court held that the death penalty was unconstitutional. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L. Ed.2d 346 (1972); Stewart v. Massachusetts, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed. 2d 744 (1972). Defendant now argues that the bargain he entered into to avoid a pos-

sible death penalty was inherently coercive, and that his waiver cannot be deemed to have been voluntarily and intelligently made. We disagree.

In an analogous case wherein the defendant agreed to plead guilty in exchange for the prosecutor's promise not to seek the death penalty we held that the plea was intelligently made:

"A plea bargain properly entered into and adhered to by the parties should not be set aside because of changes in the law occurring after the plea. To allow a defendant to come back into court and challenge a plea bargain after every change in the law not contemplated by defendant or his counsel at the time of the plea would result in no plea bargain ever being final. We find no error. * * *" State v. Nunez, 109 Ariz. 408, 411, 510 P.2d 380, 383 (1973). See also Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); Parker v. North Carolina, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970); McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

We believe the reasoning of Nunez, supra, is applicable here. From an examination of the transcript we find that the waiver of a jury trial was intelligently made based upon the law as it existed at the time of the waiver. The waiver was also voluntarily made, and it was not made any less voluntary by a subsequent change in the law.

## WAS MRS. BARR AN INCOMPETENT WITNESS?

■ Our statute on the marital privilege reads in part as follows:

"A person shall not be examined as a witness in the following cases:

"1. A husband for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, during the marriage or afterwards, be, without consent of the other, examined as to any communication made by one to the other during the

marriage. These exceptions do not apply in a criminal action or proceeding for a crime committed by the husband against the wife, or by the wife against the husband. * * *" § 13–1802 A.R.S.

Section 13–1802 A.R.S. deals with two separate and distinct concepts: incompetency of one spouse as a witness for or against the other, and the privilege held by one spouse which prevents adverse testimony by the other both during and after the marriage. The incompetency portion of our statute operates to absolutely disqualify a spouse as a witness for or against the other without his or her consent. The proscription applies only so long as the parties are married.

Defendant sought to prevent his (ex-) wife's testimony by collaterally attacking the Texas divorce decree on due process and on jurisdictional grounds. She testified as follows.

"DIRECT EXAMINATION BY MR. COCHRAN:

"Q For the record will you tell us your name, please?

"A Mrs. George Barr.

"Q And do you know the defendant James Drury?

"A Yes.

"Q And were you married to James Drury?

"A Yes, I was.

"Q When did you get married?

"MR. KASHMAN: I can't see the witness.

"A (By the witness): November the 21st—the 22nd of 1966.

"MR. COCHRAN: Q Did there come a time when you were divorced from the defendant?

"A Yes.

"Q When was that?

"A That was November the first and—

"Q And where?

"A Houston, Texas.

"Q What year?

"A 1971.

"Q Were you represented by an attorney at that time?

"A Yes, I was.

"Q What is his name?

"A Mr. Bill Daniels.

"Q To your knowledge was Mr. Drury, your ex-husband, represented by counsel?

"A Yes, he was.

"Q Who was that?

"A I don't know the attorney's name.

"Q Any other attorney besides the one in Texas?

* * * * * *

"A There was Mr. Kashman.

"Q Mr. Kashman represented him, too?

"A Yes.

"Q Have you subsequently remarried?

"A Yes.

"Q When were you remarried?

"A Four months ago.

"Q And where?

"A In Louisiana.

"Q I offer State's Exhibit Fifteen."

And:

"VOIR DIRE EXAMINATION BY MR. KASHMAN

"Q Mrs. Barr, how long were you living in Harris County, Texas, at the time you filed for divorce?

* * * * * *

"A (By the witness): I had been there six months.

"MR. KASHMAN: Been there six months?

"A Yes.

"Q You lived in Arizona before that?

"A Yes, I did.

"Q Your Honor, it's my understanding there is a one year residency requirement in Texas as there is in Arizona.

"THE COURT: Let me see the decree.

"MR. KASHMAN: I can't avow that is the Texas law, but I believe it is.

\* \* \* \* \* \*

"THE COURT: That objection is overruled. Do you have any further voir dire?

"MR. KASHMAN: I don't believe so."

The decree of divorce from the Texas court entered in evidence indicated that the defendant was "duly served," but made no appearance and was in default. The decree also contained the following written in by the court:

"No provision is made with respect to child support or visitation since it has been represented by this court that the Defendant is in the Arizona State Hospital."

The decree indicated that one James R. Clark appeared as amicus curiae. The decree does not indicate the grounds for which the divorce was granted.

The defendant contends now, as he did at trial, that he was entitled to collaterally attack the Texas decree (1) because he was incarcerated in the Arizona State Hospital at the time the divorce was granted, with no opportunity to personally appear, and was thus denied a fair hearing, and (2) because the Texas court had no jurisdiction to enter the decree. He cites § 4631 Vernon's Ann.Civ.St., which requires a one year's residence preceding the granting of a divorce decree.

The United States Supreme Court has stated that it "is the final arbiter when the question is raised as to what is a permissible limitation on the full faith and credit clause." Williams v. North Carolina (I), 317 U.S. 287, 63 S.Ct. 207, 87 L.Ed. 279 (1942). The United States Supreme Court stated:

" \* \* \* This Court only recently stated that Art. IV, § 1 and the Act of May 26, 1970, require that 'not some, but full' faith and credit be given judgments of a state court. Davis v. Davis, 305 U.S. 32, 40, 59 S.Ct. 3, 6, 83 L.Ed. 26. Thus even though the cause of action could not be entertained in the state of the forum, ei-

ther because it had been barred by the local statute of limitations or contravened local policy, the judgment thereon obtained in a sister state is entitled to full faith and credit. (citations omitted) Some exceptions have been engrafted on the rule laid down by Chief Justice Marshall. But as stated by Mr. Justice Brandeis in Broderick v. Rosner, 294 U. S. 629, 642, 55 S.Ct. 589, 593, 79 L.Ed. 1100, 'the room left for the play of conflicting policies is a narrow one.' So far as *judgments* are concerned, the decisions, [footnote omitted] as distinguished from dicta [footnote omitted], show that the actual exceptions have been few and far between, apart from Haddock v. Haddock. For this Court has been reluctant to admit exceptions in case of *judgments* rendered by the courts of a sister state, since the 'very purpose' of Art. IV, § 1 was 'to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation.' Milwaukee County v. White Co., *supra*, 296 U.S. at pages 276, 277, 56 S. Ct. [229] at page 234, 80 L.Ed. 220." Williams v. State of North Carolina (I), supra, 317 U.S. at 294–295, 63 S.Ct. at 211, 87 L.Ed. at 283.

And:

" \* \* \* *Prima facie* every state is entitled to enforce in its own courts its own statutes, lawfully enacted. One who challenges that right, because of the force given to a conflicting statute of another state by the full faith and credit clause, assumes the burden of showing, upon some rational basis, that of the conflicting interests involved those of the foreign state are superior to those of the forum. \* \* \*" Alaska Packers Ass'n v. Industrial Accident Comm., 294 U.S. 532, 547–548, 55 S.Ct. 518, 524, 79 L.Ed. 1044, 1052.

■ The validity of an ex parte divorce where there has been notice to the absent

party has long been upheld. Williams v. North Carolina (I), supra. Not only does it appear affirmatively in the case at hand that the defendant received notice of the divorce suit, but also his interests appear to have been protected by an amicus curiae in the proceeding. The testimony of the wife indicates that Mr. Kashman, defense counsel in this present criminal matter, also represented the defendant in the divorce and he does not, on the record, deny this. We therefore reject defendant's contention that he was entitled to attack the decree on due process grounds.

Secondly, an absent party to an ex parte divorce proceeding may collaterally attack the decree of a sister state for lack of jurisdiction without violating the full faith and credit clause of the United States Constitution. Williams v. North Carolina (II), 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945). There is an exception to this rule, however, where the absent defendant has had a prior opportunity to raise the issue. Thus, in Sherrer v. Sherrer, 334 U.S. 343, 68 S.Ct. 1087, 92 L.Ed. 1429 (1948), the United States Supreme Court held:

"* * * [T]he requirements of full faith and credit bar a defendant from collaterally attacking a divorce decree on jurisdictional grounds in the courts of a sister State where there has been participation by the defendant in the divorce proceedings, where the defendant has been accorded full opportunity to contest the jurisdictional issues, and where the decree is not susceptible to such collateral attack in the courts of the State which rendered the decree [footnote omitted]." 334 U.S. at 351–352, 68 S.Ct. at 1091, 92 L.Ed. at 1436.

See also Coe v. Coe, 334 U.S. 378, 68 S.Ct. 1094, 92 L.Ed. 1451 (1948), where the defendant had personally appeared in and participated in the divorce proceeding, and Johnson v. Muelberger, 340 U.S. 581, 71 S.Ct. 474, 95 L.Ed. 552 (1951), where counsel for the non-resident spouse appeared in the Florida court and contested the merits of the suit. The United States Supreme Court, however, has gone no further in interpreting the full faith and credit clause of the United States Constitution in defining the precise nature and limits of participation which would estop a defendant seeking to collaterally attack the divorce decree of a sister state. Other jurisdictions which have considered the matter have required varying degrees of participation and opportunity to raise the issue of domicile. See Note: Participation By Defendant Spouse In A Foreign Divorce Action: State Court Interpretation of the "Sherrer" Doctrine, 34 Ind.L.J. 592 (1959).

■ We are of the opinion, from the limited record the defendant has presented in this case, that the defendant cannot now successfully attack the Texas decree. Defendant had notice of the pending divorce action and was represented by independent counsel, who could have raised any jurisdictional question at the time and otherwise participated in the Texas divorce. See Jamieson v. Jamieson, 14 Ill.App.2d 233, 144 N.E.2d 540 (1957). Since we give full faith and credit to the Texas decree, Mrs. Barr was not precluded from testifying under the incompetency provision of § 13–1802 A.R.S.[1]

## DID THE TESTIMONY OF DEFENDANT'S FORMER WIFE VIOLATE DEFENDANT'S MARITAL PRIVILEGE?

■ The marital privilege of the spouse given by § 13–1802 A.R.S. survives the marriage, but it applies only to "communication[s] made by one to the other during the marriage."

The defendant's former wife gave very damaging testimony on behalf of the State. Prior to her testimony the defendant

---

1. It is noted that the presentence report states that defendant was married in Mexico when he was 18 and that he did not obtain a divorce because he did not feel the marriage was legal. If this marriage is still valid, then the marriage to Joyce was never a valid marriage.

made a continuing objection to any testimony concerning either verbal or non-verbal confidential communications made during the marriage. The court ruled that Mrs. Barr would not be allowed to testify as to any conversations between herself and the defendant, but that all other testimony would be allowed.

In an early case this court held that the marital privilege applies only to confidential communications. "In other words, [spouses] may testify as to what was *done* by either spouse, but not as to what was *said.*" Posner v. N. Y. Life Ins. Co., 56 Ariz. 202, 106 P.2d 488 (1940). In a later case we held that the communication must be one which occurs in a context which inspires or induces confidentiality. Arizona Title Guarantee & Trust Co. v. Wagner, 75 Ariz. 82, 251 P.2d 897 (1952). And our Court of Appeals has held that the marital privilege applies only to words and not to acts. State v. Hunt, 8 Ariz.App. 514, 447 P.2d 896 (1968). Defendant urges that we reconsider our prior decisions and extend the privilege to any confidential communication whether it be oral conversation or conduct.

There is some disharmony among the various jurisdictions on the precise issue with which we are faced, with perhaps a majority of the states disallowing testimony as to communicative conduct as well as conversation. See 38 A.L.R.2d 567; McCormick on Evidence, Marital Communication—Privilege, § 79, pp. 163–65. There are a number of commentators and textwriters, however, who hold the view that the privilege is an obstacle to the pursuit of truth, that it serves no real function in the reality of married life, and that it should be limited rather than expanded. See McCormick on Evidence, supra, § 86, pp. 172–73; Hutchins and Slesinger: Some Observations on the Law of Evidence: Family Relations, 13 Minn.L.Rev. 675 (1929); Hines: Privileged Testimony of Husband and Wife in California, 19 Calif.L.Rev. 390 (1931). We agree with this latter view, and so, we are not persuaded to overrule our previous cases at this time. We hold that the testimony of Mrs. Barr was properly allowed.

## WAS THE DEFENDANT'S INCULPATORY STATEMENT VOLUNTARY?

Defendant's next argument is that the court erred in finding that his statement was voluntarily given and thus properly admissible as evidence. The trial court found as follows:

"THE COURT: Show that it's the finding of the court that the defendant was advised of his constitutional rights prior to the taking and making of the statement. It's the further finding that he understood these rights and that he made a voluntary waiver of these rights. Each of these findings is made beyond a reasonable doubt."

The trial court actually applied a stricter standard of proof than is constitutionally required for in Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), the United States Supreme Court held that voluntariness need only be shown by a preponderance of the evidence. In Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court discussed the criteria by which voluntariness of a confession should be judged. The court wrote:

"In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, *e.g.*, Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L. Ed.2d 224; his lack of education, *e.g.*, Payne v. Arkansas, 356 U.S. 560, 78 S. Ct. 844, 2 L.Ed.2d 975; or his low intelligence, *e.g.*, Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; the lack of any advice to the accused of his constitutional rights, *e.g.*, Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16

L.Ed.2d 895; the length of detention, *e. g.*, Chambers v. Flordia, *supra*; the repeated and prolonged nature of the questioning, *e.g.*, Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192; and the use of physical punishment such as deprivation of food or sleep, *e.g.*, Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 [footnote omitted]. In all of these cases, the Court determined the factual circumstances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. Culombe v. Connecticut, *supra,* 367 U.S. at 603, 81 S.Ct., at 1879.

"The significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances. * * * 412 U.S. at 226, 93 S.Ct. at 2047, 36 L.Ed.2d at 862.

In assessing the totality of the circumstances in the instant case, we note that the defendant was advised of his Miranda rights, he stated that he understood those rights and wished to waive them, there is no evidence of physical mistreatment, and there is no evidence of mental duress. On the other hand, defendant had been incarcerated for a period of ten days on another charge, and psychiatric testimony at trial reveals that the defendant has an I.Q. of 77, and is classified as a "borderline mental retard." Two defense psychiatrists, in fact, testified that in their opinion the defendant probably had trouble understanding the substance of his Miranda rights.

■ Low intelligence is not a controlling criterion that would negate an otherwise voluntary and intelligent waiver. When we examine all the factors presented by the record, we come to the inevitable conclusion that the evidence established by a preponderance, if not beyond a reasonable doubt, that the confession was voluntary and the trial court did not err in admitting it into evidence.

## WAS DR. CLEARY'S TESTIMONY PROPERLY ADMITTED?

■ During the trial, the defendant had introduced into evidence a discharge summary from the Texas State Hospital:

"Q [By Mr. Kashman] Let me show you, Doctor Cutts, Defendant's Exhibit 'G' for Identification and ask you if you recognize that psychiatric summary?

"A Yes, I believe you presented this to me about a week ago.

"Q You have had an opportunity to read that over?

"A Yes.

"Q Your Honor, at this time I would advise the court that Exhibit 'G' is a psychiatric summary prepared by Doctor L. F. Wilson, from San Antonio, Texas. Mr. Cochran plans to put Doctor Wilson on tomorrow. This would be advanced rebuttal, and it's offered solely for that purpose at this time to avoid having to call Doctor Cutts back.

"THE COURT: You've no objection?

"MR. COCHRAN: I've no objection, no.

"THE COURT: All right.

"MR. KASHMAN: I would like to offer Exhibit 'G' so I can question Doctor Cutts.

"MR. COCHRAN: No objection.

"THE COURT: Go ahead, 'G' may be admitted."

Later in the trial when Dr. Michael Cleary, a psychiatrist employed as chief of the maximum security division of the Arizona State Hospital, testified on behalf of the State rebutting defense testimony on the insanity issue, the defendant objected to Dr. Cleary basing any of his opinion upon the Texas discharge summary:

"MR. KASHMAN: My objection is to this witness making or stating opinions based on information that's not before the court and not available

to counsel to use for cross examination.

\*　　\*　　\*　　\*　　\*　　\*

"MR. KASHMAN: Q Doctor, have you ever seen Exhibit 'G' before or a copy thereof?

"A　Yes sir.

"Q　In the course of your testimony and in referring to material from Texas was there any other material other than Exhibit 'G' that was available to you?

"A　No sir, this is the one. I stated in my examination, and my diagnosis of February 28th, the psychological testing was summarized as follows. Then I quoted two or three lines in there.

"Q　So you haven't had any opportunity to see the actual psychologist's report or the tests themselves or anything other than a summary made in March of 1969?

"A　That's correct.

"Q　I would definitely object to it as I have already, to the conclusions and opinions based on summaries, on summarized statements by a third party.

"THE COURT: No, the objection is overruled.

"MR. COCHRAN: That information is already in evidence.

"THE COURT: It's in the hospital records, too, and they are in evidence."

We have stated:

"\* \* \* an expert may not base his opinion upon the inferences and conclusions of others, (citations omitted). The purpose of this rule is to prevent the expert from basing his testimony on assumptions which are unknown to the jury and unsupported by the evidence. \* \* \*" Gillespie Land and Irrigation Co. v. Gonzalez, 93 Ariz. 152, 159, 379 P.2d 135, 141 (1963). See also State v. Gevrez, 61 Ariz. 296, 148 P.2d 829 (1944).

In the instant case, however, Exhibit G was in evidence and the doctor could base his opinion upon the evidence already admitted by the defendant:

"An expert may be allowed, in cases where expert opinion is appropriate, to interpret facts in evidence which the jury are not qualified to interpret for themselves, McCormick, Evidence § 13, p. 28 (1954). He may base such an opinion either on his personal observations given into evidence, Gray v. Woods, 84 Ariz. 87, 324 P.2d 220 (1958), or upon assumption that some portion of the testimony of others already in evidence is true. \* \* \*" Gilbert v. Quinet, 91 Ariz. 29, 32, 369 P.2d 267, 268 (1962).

We find no error.

## WAS THERE SUFFICIENT EVIDENCE OF CRIMINAL AGENCY?

The evidence concerning the death was conflicting. Dr. Edward Brucker, the pathologist who performed the autopsy on Foster, testified that his examination of Foster revealed multiple external abrasions, a fractured rib, a fractured jaw, and hemorrhages throughout the body. He further testified that in his opinion the traumatic injuries caused Foster to vomit and impeded his ability to expel the vomit, causing in turn the aspiration which was the ultimate cause of death. He admitted on cross examination, however, that Foster's blood alcohol level could have induced vomiting irrespective of the injuries. He also stated that the injuries caused by the beating could not alone have resulted in death.

Dr. Charles Leroy Crone, a specialist in gastroenterology, was called to testify on behalf of the defendant. He testified that although there is no direct correlation between excessive ingestion of intoxicants and vomiting because of other factors such as the amount of food one has eaten, one's tolerance to alcohol, and whether different kinds of alcohol have been mixed, nevertheless there is a relationship between the

two. He stated that frequently a high intake of alcohol such as was indicated by Foster's .27 reading, could cause gastritis and consequent vomiting. He also stated that alcohol could act directly on the vomiting center of the brain. In turn, intoxication could so affect one's normal reflexes in the expulsion of vomit through the mouth that aspiration could result. Dr. Crone also agreed with Dr. Brucker that traumatic injuries frequently cause one to vomit, and that the injuries such as Foster suffered could impede his ability to expel the vomit through the mouth.

As noted in our recitation of the facts, after his preliminary hearing, the defendant challenged, by petition for writ of habeas corpus, the finding that there was probable cause to believe that the death of Foster was caused by a criminal agency. Drury v. Burr, 13 Ariz.App. 164, 474 P.2d 1016 (1970). On petition for review we stated:

" * * * From this testimony, defendant concludes that probable cause was not established, since, as he states, it was too conjectural to support the inference that death was caused by a criminal agency.

"We do not agree. The very nature of the severity of the beating inflicted upon the deceased compels the inference that the defendant intended great bodily injury with the attendant likelihood that death would result. The nature and extent of the injuries are reflective of an intent equivalent to a criminal purpose aimed against life. An inference of intent to kill can be drawn from these facts as well as such other facts as the failure to obtain medical attention for the deceased. People v. Geiger, 10 Mich.App. 339, 159 N.W.2d 383.

"If we assume the intoxication of the deceased was the cause of his vomiting, it is clearly an antecedent condition which, concurring with the defendant's blow breaking the deceased's jaw, combined to cause the death.

'One who inflicts an injury on another is deemed by the law to be guilty of homicide if the injury contributes mediately or immediately to the death of such other. The fact that other causes contribute to the death does not relieve the actor of responsibility, provided such other causes are not the proximate cause of the death.' State v. Cooley (Mo.) 387 S.W.2d 544.

"And see State v. Minton, 234 N.C. 716, 68 S.E.2d 844, 31 A.L.R.2d 682; State v. Catellier, 63 Wyo. 123, 179 P.2d 203. Moreover, it is not indispensible to a conviction that the wounds be fatal and the direct cause of death. It is sufficient that they cause death indirectly through a chain of natural effects and causes unchanged by human action. 40 Am.Jr.2d, Homicide, § 20 (1968). And see Commonwealth v. Cheeks, 423 Pa. 67, 223 A.2d 291." Drury v. Burr, 107 Ariz. 124, 125–126, 483 P.2d 539, 540–541 (1971).

While the opinion of this court in Drury v. Burr, supra, was limited to the facts presented at the preliminary hearing and the determination of probable cause, we believe that the language of the court, when considered in light of the facts presented at the trial, is dispositive of this matter.

Although the testimony indicates that it was possible for Foster to have died from causes independent of the beating, we believe that there was sufficient evidence from which the trier of fact could have found that the beating contributed to Foster's death. State v. Bearden, 99 Ariz. 1, 405 P.2d 885 (1965); State v. Rivera, 94 Ariz. 45, 381 P.2d 584 (1963); State v. Mahan, 92 Ariz. 271, 376 P.2d 132 (1962). We find no error.

## WAS THE EVIDENCE SUFFICIENT?

Defendant also contends that there was insufficient evidence to support a finding of malice, which is a necessary element of the crime of second degree murder. §§ 13–451, 13–452 A.R.S.; State v. McIntyre, 106 Ariz. 439, 477 P.2d 529 (1970). He claims that any possible evidence of malice was negated by countervailing evidence of

his intoxication, provocation by the deceased, and his diminished mental capacity.

■■■■ We have previously indicated that voluntary intoxication may produce a state of mind which incapacitates an accused from forming malicious intent. State v. Contreras, 107 Ariz. 68, 481 P.2d 861 (1971). In the instant case there was evidence that the defendant had imbibed a large quantity of alcohol prior to the subject beating. Provocatory conduct, too, may negate malice if it is of such a nature as would ordinarily arouse the passions of the reasonable man. § 13–451(B) A.R.S.; State v. Harwood, 110 Ariz. 375, 519 P.2d 177; State v. Schantz, 98 Ariz. 200, 403 P.2d 521 (1965); State v. Douglas, 2 Ariz.App. 178, 407 P.2d 117 (1965). The defendant's statement in the instant case is some evidence that the deceased provoked the defendant. As to defendant's contention that his diminished mental capacity prevented him from forming the requisite malicious intent, this court has specifically rejected the doctrine of partial responsibility. State v. Harwood, supra; State v. Malumphy, 105 Ariz. 200, 461 P.2d 677 (1969); State v. Narten, 99 Ariz. 116, 407 P.2d 81 (1965); State v. Schantz, supra. In any event, this evidence was all before the trial court, and in his summation defense counsel urged that the evidence was sufficient to reduce the grade of the offense. We must assume that the court considered the evidence and weighed it against contrary evidence of malice. We feel that the severity of the beating—particularly considering the vast difference in age between the defendant (23) and the deceased (59)—, the use of a piece of wood as a bludgeon, and the calculated effort to conceal the beating instead of seeking medical help are all facts from which the trier of fact could infer malice. § 13–451(B) A.R.S. Although an instruction on manslaughter would find support in the facts were this case tried to a jury, this does not mean that the court, any more than a jury, must find the lesser grade of offense. There being ample evidence from which the court could find the malice essential to second degree murder, we will not disturb the judgment of the trial court on appeal.

## IS THE SENTENCE EXCESSIVE?

■■■ The defendant finally asks us to exercise our power to reduce his thirty to forty year sentence pursuant to § 13–1717 A.R.S. He suggests that the sentence imposed reflects a "fundamental misconception of modern penology."

In a recent case we reaffirmed that the purpose of our criminal laws are multifold:

"In State v. Kennedy, 106 Ariz. 190, 472 P.2d 59 (1970), we held that not only are punishment and rehabilitation two objectives of our penal laws, but also there is the function of protecting society from further harm by the criminal. * * *" State v. Battelle, 110 Ariz. 436, 520 P.2d 308.

The presentence report reveals that the defendant has had an established predilection for violence in his history. The sentence is within the statutory limits, § 13–453(B) A.R.S., and we find no abuse of the trial court's discretion. State v. Fischer, 108 Ariz. 325, 498 P.2d 147 (1972).

Judgment affirmed.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.