21808

The STATE, Respondent, v. H. Wesley COPELAND and Sammy David Roberts, Appellants.

(311 S. E. (2d) 387)

*Appellate Defender John L. Sweeny, Asst. Appellate Defenders David W. Carpenter* and *Tara D. Shurling, S. C. Com'n of Appellate Defense,* and *David I. Bruck,* Columbia, and *Peter F. Them, II,* and *John G. Frampton,* Summerville, *for appellants.*

*Atty. Gen. Daniel R. McLeod, Sr., Asst. Atty. Gen. Brian P. Gibbes* and *Asst. Atty. Gen. Lindy P. Funkhouser,* Columbia, and *Sol. Charles M. Condon,* Charleston, *for respondent.*

Nov. 10, 1982.

GREGORY, Justice:

Appellants Wesley Copeland and Sammy Roberts were convicted of armed robbery, kidnapping, and murder. Both received sentences of twenty-five years, life, and death for the respective offenses. They appeal, asserting numerous exceptions. We consolidate their appeals with our mandatory review pursuant to S. C. Code Ann. § 16-3-25 (Cum. Supp. 1981). We vacate their life sentences for kidnapping, and otherwise affirm.

Sometime around midnight, June 18, 1980, Bill Spain and Butch Krause were closing for the night the service station where they worked. They were robbed of One Thousand Ninety-Six and 03/100 ($1,096.03) Dollars, taken from the station in North Charleston to a secluded spot in Berkeley County, and shot to death. In the early morning hours of June 19, 1980, Louis Cakley, a service station attendant in Moncks Corner, was robbed of Four Hundred Twenty-Six and 11/100 ($426.11) Dollars, taken to another secluded spot in Berkeley County, and shot to death.

The bodies of the three men were found several days after the murders. Investigations began immediately and continued for several months. On October 24, 1980, upon information given to the authorities by Danny Ray Coker, an accomplice in these crimes, appellants were arrested for the armed robbery, kidnapping, and murder of the three men. Coker was granted immunity from prosecution in exchange for his testimony.

First, appellants challenge the constitutionality of the South Carolina death penalty statutes. We held these statutes constitutional in *State v. Linder*, 276 S. C. 304, 278 S. E. (2d) 335 (1981) and *State v. Goolsby*, 275 S. C. 110, 268 S. E. (2d) 31 (1980), *cert. denied*, 449 U. S. 1037, 101 S. Ct. 616, 66 L. Ed. (2d) 500 (1981).

Next, appellants contend imposition of the death penalty for the crime of murder while in the commission of kidnapping violates the Eighth Amendment prohibition against arbitrary infliction of the death penalty because the statutory definition of kidnapping is overbroad and ambiguous. We held in *State v. Plath*, 277 S. C. 126, 284

S. E. (2d) 221 (1981) and *State v. Smith*, 275 S. C. 164, 165, 268 S. E. (2d) 276 (1980), the kidnapping statute is constitutional, not overbroad and ambiguous. This exception is without merit.

Appellant Roberts argues it is unconstitutional to sentence a person to death without finding that he caused or intended another's death. He contends this offends both the Eighth Amendment mandate that any decision to impose the death penalty be based on reason rather than caprice and the Cruel and Unusual Punishment Clause of the Eighth Amendment.

Recently, the U. S. Supreme Court reversed a Florida Supreme Court judgment upholding the death penalty because there was no proof the codefendant killed, attempted to kill, intended or contemplated that life would be taken. *Enmund v. Florida*, 458 U. S. 782, 102 S. Ct. 3368, 73 L. Ed. (2d) 1140 (1982).

We think imposition of the death penalty in this case does not offend the standards set out in *Enmund, supra.* The evidence is clearly sufficient to justify the death penalty. It shows Roberts did, in fact, cause Cakley's death, and, while not the triggerman in the two earlier murders, he was present the entire time the crimes were committed, and he held a gun on at least one of the two victims and forced him to lay on the ground whereupon both men were shot to death. Roberts cannot seriously contend that he did not intend or contemplate that life would be taken.

We do not find the jury's recommendation to be the result of passion, prejudice, or any other arbitrary factor, nor do we find imposition of the death penalty unconstitutional in Roberts' case.

Next, appellants argue the trial judge erred in refusing to change venue to another county.

A change of venue is addressed to the judicial discretion of the trial judge, and his decision will not be disturbed absent a showing of an abuse of that discretion. *State v. Valenti*, 265 S. C. 380, 218 S. E. (2d) 726 (1975). Where the trial judge bases his ruling on adequate *voir dire* examination of the jurors, his conclusion that the objectivity of the jury panel has not been polluted with outside influence will not be disturbed absent extraordinary circumstances. *State v. Fowler*, 266 S. C. 203, 222 S. E. (2d) 497 (1976); *State v. Crowe*, 258 S. C. 258, 188 S. E.

(2d) 379, *cert. den.*, 409 U. S. 1077, 93 S. Ct. 691, 34 L. Ed. (2d) 666 (1972).

*State v. Neeley*, 271 S. C. 33, 244 S. E. (2d) 522, 524 (1978). Appellants must prove actual juror prejudice. *State v. Plath, supra; State v. Goolsby, supra; State v. Tyner*, 273 S. C. 646, 258 S. E. (2d) 559 (1979). The record shows maximum precaution by the trial judge to ensure elimination of veniremen who may have been prejudiced by pretrial publicity and the absence of prejudice on the part of the jurors. Appellants' motions for change of venue were properly denied.

Next, appellants argue the trial court erred in denying ██ their motions for continuance. A motion for continuance is addressed to the sound discretion of the trial judge and his ruling thereon will not be disturbed absent a showing of abuse of discretion. *State v. Brooks*, 271 S. C. 355, 247 S. E. (2d) 436 (1978). We find no abuse of discretion on the part of the trial judge.

Appellants further argue the trial court erred in dis-██ qualifying jurors who oppose the death penalty. This issue was resolved adversely to appellants in *State v. Hyman*, 276 S. C. 559, 281 S. E. (2d) 209 (1981); *State v. Linder, supra; State v. Goolsby, supra; State v. Tyner, supra.*

Next, appellants argue the trial court erred in dis-██ qualifying Anthony Gadsden, a member of the venire, because of his strong feelings against the death penalty where the record did not show he was irrevocably committed to vote against imposition of the death penalty. The questioning process of Mr. Gadsden, viewed in its entirety, clearly demonstrates his unwillingness to vote for the death penalty. The questioning process was consistent with the standards established in *Witherspoon v. Illinois*, 391 U. S. 510, 88 S. Ct. 1770, 20 L. Ed. (2d) 776 (1968). Thus, the trial court did not err in disqualifying Mr. Gadsden for cause.

Appellants next argue the trial court erred in qualify-██ ing a venireman who indicated he would impose the death penalty in every case of aggravated murder. The questioning process of this venireman clearly demonstrates he would not impose the death penalty in every case of aggravated murder, but would follow the trial court's instructions and bring in a life sentence if he thought it was proper. This exception is meritless.

Appellants argue the solicitor's closing argument at the first phase of the trial was improper. In his closing argument, the solicitor stated, "[Danny Ray Coker] is going to prison for at least — I submit to you for somewhere around twenty years." Allegedly, this statement is not supported by evidence established at trial and attempts to bolster the credibility of the State's key witness by distracting the minds of the jurors from the fact that Coker received complete immunity from prosecution in exchange for his testimony.

Throughout the record is testimony that Coker will be sentenced to one — twenty (1-20) years for various crimes he committed in Sumter. We do not see how the fact that Coker will be sentenced for other crimes he committed could in any way *bolster* his credibility. In addition, the solicitor discusses the immunity agreement with Coker in the next paragraph of his argument. Thus, rather than distracting the minds of the jurors from the fact that Coker is receiving complete immunity from prosecution for his part in these murders, the solicitor calls this fact to their minds.

The trial judge has wide discretion in dealing with the range and propriety of the solicitor's argument to the jury, and ordinarily his rulings on such matters will not be disturbed. *State v. Durden*, 264 S. C. 86, 212 S. E. (2d) 587 (1975). We find no error.

Next, appellant Copeland argues the trial judge improperly commented on the facts during his instruction on the law concerning the presumption of innocence, and thereby injected his opinion thereof. The instruction complained of is as follows:

> The presumption of innocence accompanies the defendant throughout the trial of this case and, when you go to the jury room to deliberate, it follows the defendant there with you and it entitles him to a verdict of not guilty at your hands until such time as you are convinced that the State of South Carolina has proven to your satisfaction that the defendant is guilty beyond a reasonable doubt. And *if the state has satisfied you of the defendant's guilt beyond a reasonable doubt, then that presumption of innocence disappears; and you would write a verdict that speaks the truth of this controversy.* (Emphasis added.)

No reasonable interpretation of this portion of the trial judge's charge can result in the conclusion that he commented on the facts and injected his opinion as to the guilt of appellant. This exception is frivolous and without merit.

Appellants next argue the trial judge erred in defining reasonable doubt as "a doubt that is well founded in reason" and "a substantial doubt." The trial judge's definition of reasonable doubt is well within the guidelines set by this Court. *State v. Butler*, 277 S. C. 452, 290 S. E. (2d) 1 (1982); *State v. Griffin*, 277 S. C. 193, 285 S. E. (2d) 631 (1981). There is no error.

Appellant Copeland argues the trial judge erred in refusing to instruct the jury that their sentencing recommendation would be binding upon the trial judge. We resolved this issue in *State v. Linder, supra*, 278 S. E. (2d) at 338-339.

> Use of the word "recommend" by the trial judge or solicitor is not *per se* suspect. Under the statute "recommendation" is the term applied to the jury's function at this phase of the trial. To instruct the jury that it will recommend what sentence the convicted murderer *will be given* is not improper and does not mask the true nature of the jurors' responsibility at this phase of the trial.

We find no error.

Appellants argue the trial court erred in failing to instruct the jury that a police officer's testimony concerning a witness's statement prior to trial which is inconsistent with that witness's statement made at trial, is to be considered solely for impeachment purposes. Lieutenant Nettles of the Berkeley County Sheriff's Department testified that Bilangia Thomas, who was in a jail cell next to Coker, told him the guns used in the murders of the three men were buried behind Wesley Copeland's trailer. Bilangia Thomas denied at trial telling Lt. Nettles anything concerning the guns. We held in *State v. Warren*, 277 S. C. 167, 284 S. E. (2d) 355 (1981) that "when a prior inconsistent statement is introduced to impeach a witness, the court, *upon request*, must instruct the jury that it can consider such evidence for the purpose of impeachment only . . . ." (Emphasis added). Here, appellants did not request the trial judge to instruct the jury

to consider Lt. Nettles' testimony only for impeachment purposes.

Heretofore, South Carolina has followed the traditional rule that testimony of inconsistent statements is admissible only to impeach the credibility of the witness. Henceforth from today, we will allow testimony of prior inconsistent statements to be used as substantive evidence when the declarant testifies at trial and is subject to cross examination. We quote with approval the reasoning by the Supreme Court of Georgia in *Gibbons v. State*, 248 Ga. 858, 286 S. E. (2d) 717, 721 (1982), in adopting this new prior inconsistent statement rule:

> [C]ommentators . . . suggest that the oath is not as strong a guaranty of truth as once it may have been, and the requirements that the jury observe the declarant and that the defendant have an opportunity to cross-examine are met where the declarant takes the stand and is subject to cross-examination. The assertion by a person that the declarant made a prior statement is not itself heresay, and the jury can determine the credibility of the witness on that point. With respect to the truth of the prior statement, the jury has the opportunity to observe the declarant as he may repudiate or vary his former statement, and as he is cross-examined. Thus, the jury can determine whether to believe the present testimony, the prior testimony — or neither . . . [P]rior statements . . . are made closer in time to the event in question, when memories are fresher, and . . . the traditional rule requires the courts to give unrealistic and confusing instructions to the jury. See 3A Wigmore, Evidence (Chadbourn rev.) § 1018; McCormick, Handbook of the Law of Evidence, (2d) ed., § 251, Morgan, *Hearsay, Dangers and the Application of the Hearsay Concept*, 62 Harv. L. R. 177, 192 et seq. (1948).

We believe the adoption of this rule will more effectively aid in the discovery of truth, and more adequately insure the freedom of the innocent and the conviction of the guilty.

Appellant Copeland argues the trial court should have allowed introduction in the sentencing phase of the results of the state's key witness's polygraph examination. Copeland

the subject matter was irrelevant and not responsive to any testimony of defense witnesses. They believe themselves to have been prejudiced by the introduction of an arbitrary factor into the sentencing deliberations — that is, speculation as to possible escape or premature release. We find that the record, read as a whole, fails to support appellants' claims.

The course of this trial dramatically demonstrates why this Court has prohibited testimony on the theory and propriety of capital punishment as such. In this case, the defense sought to portray life imprisonment as preferable to capital punishment as a matter of social policy. With the exception of Dr. Neidig's testimony, the entire defense of appellant Arnold was based upon an attempted showing that capital punishment was an ineffective instrument of deterrence, a crude device for expressing social disapproval, and even a counterproductive approach to control of crime. As noted above, defense witness Pearson drew a picture of life imprisonment as slavery, a condition of irretrievable loss which he invited the jury to contemplate through vivid recollection of many years' experience in teaching and counseling inmates of CCI. This testimony was elaborated and bolstered through cross-examinations by counsel for appellant Plath. Parenthetically, we note and reject Plath's inconsistent contention that he was improperly denied a limiting jury instruction on the alternative penalties. We find, moreover, that the trial judge amply explained the binding effect of a jury recommendation in both his jury instructions and in the individual voir dire of jurors.

It is our settled view that such a defense is highly improper, for it invites the jury to intrude upon the strictly legislative function of determining the nature of crime and punishment under our Constitution. In the sentencing phase of a capital case, the jury shall understand the terms "life imprisonment" and "death sentence" in their ordinary and plain meaning without elaboration.

In the sentencing phase of a capital case, the function of the jury is not to legislate a plan of punishment but to make the "either/or" selection called for by the language of 16-3-20(A), Code, which in pertinent part provides: "A person who is convicted of or pleads guilty to murder shall be punished by death or by imprisonment for life...."

clarification; therefore, we cannot say the trial judge's statement was erroneous. Moreover, the defendant, with assistance of counsel, is the one to decide whether to testify at his trial. He cannot be permitted to profit from his faulty interpretation of the trial court's statement.

Appellant Roberts argues the solicitor improperly inserted his own opinion that capital punishment deters crime into his closing argument at the sentencing phase of the trial. We disagree.

"While the solicitor should prosecute vigorously, *State v. Davis*, 239 S. C. 280, 122 S. E. (2d) 633, his duty is not to convict a defendant but to see justice done. *State v. Allen*, 266 S. C. 468, 224 S. E. (2d) 881 (1976). The solicitor's closing argument must, of course, be based upon this principle. The argument therefore must be carefully tailored so as not to appeal to the personal bias of the juror nor be calculated to arouse his passion or prejudice. *State v. White*, 246 S. C. 502, 144 S. E. (2d) 481 (1965). The trial judge is vested with a broad discretion in dealing with the propriety of the argument of the solicitor to the jury. *State v. Durden, supra.* Once the trial judge has allowed the argument to stand, as here, the defendant must bear the burden of demonstrating that the argument in effect denied him a fair determination of his guilt or innocence. On appeal, this Court will review the alleged impropriety of argument in the context of the entire record."

*State v. Woomer*, 277 S. C. 170, 284 S. E. (2d) 357, 359 (1981) [quoting *State v. Linder*, 276 S. C. 304, 278 S. E. (2d) 335, 339 (1981)].

Viewing the argument in the context of the entire record, we find the solicitor's argument is properly within the guidelines set by this Court.

Appellant Copeland argues the trial judge erred in denying his request to instruct the jury of the actual effect of failure to reach a unanimous agreement as to punishment, and in instructing the jury that unanimity is required before a life sentence can be imposed. Copeland asserts the judge misstated the applicable law and inserted an arbitrary factor into the jury's sentencing decision by instructing "irrespective of what your verdict or recommenda-

tion is, it must be unanimous on each count, that is, your verdict or recommendation must be the verdict or recommendation of all twelve of you." Allegedly, this instruction might affect the jury's decision to impose life or death unless the jury is instructed that, in the event all cannot agree on a recommendation as to whether the death penalty should be imposed, the trial judge shall dismiss the jury and sentence the defendant to life imprisonment. We disagree.

The trial judge correctly stated the applicable law. We stated in *State v. Adams, supra*, 283 S. E. (2d) at 587:

> The language of [§ 16-3-20(C)] provides that where a sentence of death is not recommended by the jury, a life sentence must be given. The situation implicitly envisioned here is that normally the jury will unanimously either recommend life or death. The undecided jury is the exception. That portion of the statute addressing the legal effect given to the existence of an unalterably divided jury is addressed to the trial judge only and need not be divulged to the jury.

There is no error present.

Appellants next argue the trial judge's charge and written statutory instructions concerning mitigating circumstances were insufficient to alert the jurors that they could consider mitigating circumstances other than the nine statutory mitigating circumstances.

Section 16-3-20(C) of the Code requires the trial judge to instruct the jury to consider "any mitigating circumstances otherwise authorized or allowed by law and any ... statutory ... mitigating circumstances ..." The trial judge fully complied with this provision. This exception is without merit.

Appellant Copeland argues the trial court erred in failing to instruct the jury that life imprisonment means one will actually spend his life in prison. Copeland asserts the jury will consider the possibility of parole in its deliberations and the failure of the trial court to instruct the jury not to consider it injects an arbitrary factor into the trial. Again, we disagree.

The jurors were instructed to base their decisions solely upon the evidence adduced at trial and the law as instructed by the trial judge. While it is true that possibility of parole

should not be considered by the jury, it is not the duty of the trial court to anticipate or speculate that jurors might consider it in their deliberations and instruct them accordingly. To do so may, in fact, inject consideration of parole into their deliberations where it may not before have been.

Appellants next argue the trial judge should have instructed the jury that they must find the death penalty is appropriate beyond a reasonable doubt. The trial judge repeatedly instructed the jurors they must find the existence of a statutory aggravating circumstance beyond a reasonable doubt before they could impose the death penalty. He further instructed the jurors that they could recommend a sentence of life imprisonment even if they found the existence of a statutory aggravating circumstance beyond a reasonable doubt. The jurors must have had the phrase "beyond a reasonable doubt" firmly etched in their minds at this point in the bifurcated trial. Surely, appellants would not have us believe a person of ordinary sensibilities would recommend imposition of the death penalty if he had a reasonable doubt that it was an appropriate sentence in that case. This exception is frivolous and without merit.

This appeal represents the sixth occasion for this Court to perform the statutory function known as "proportionality review," mandated by § 16-3-25(C) of the Code. (1977 Act No. 177, section 2, eff. June 8, 1977.) *State v. Thompson,* 278 S. C. 1, 292 S. E. (2d) 581, *cert. denied,* 456 U. S. 938, 102 S. Ct. 1996, 72 L. Ed. (2d) 458 (1982); *State v. Butler, supra; State v. Gilbert,* 277 S. C. 53, 283 S. E. (2d) 179 (1981); *State v. Hyman, supra; State v. Shaw,* 273 S. C. 194, 255 S. E. (2d) 799, *cert. denied,* 444 U. S. 957, 100 S. Ct. 437, 62 L. Ed. (2d) 329 and *Roach v. South Carolina,* 444 U. S. 1026, 100 S. Ct. 690, 62 L. Ed. (2d) 660.

Appellant Copeland attacks the constitutionality of the South Carolina death penalty regime on the basis of this Court's interpretation of § 16-3-25(C) of the Code. The issue is raised in the face of the very recent holding in *State v. Thompson, supra,* published well before appellant's brief was filed. The issue is raised without the benefit of a petition under Supreme Court Rule 8, section 10, and amounts in our view to a "reopening of closed question" as discussed in *State v. Truesdale,* 278 S. C. 368, 296 S. E. (2d) 528 (1982). Normally the issue would be dismissed without comment. We

deem it appropriate, however, to make one final pronouncement on the proper interpretation of § 16-3-25(C) at this time.

The General Assembly of South Carolina has clearly made the policy determination that proportionality review by this Court shall be accorded capital defendants who actually receive a sentence of death. The language of § 16-3-25(C) puts three questions before this Court for review in a given case:

1. Whether sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and
2. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 16-3-20, and
3. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

It is the third inquiry which constitutes proportionality review in South Carolina. Under the statute, the task of defining "similar cases" and with it the scope of any comparative analysis is plainly and properly left to this Court. As indicated below, both the statutory language and the nature of the task give rise to perplexity. There is, after all, some logic to the view that the heinous crime is *sui generis*, simply beyond comparison.

A complex of federal constitutional issues has enveloped all death penalty statutes since *Furman v. Georgia*, 408 U. S. 238, 92 S. Ct. 2726, 33 L. Ed. (2d) 346 (1972). This Court has taken careful note of U. S. Supreme Court decisions touching upon proportionality review, and we find in these decisions a profound tension between the requirement of individualized sentencing and the notion of comparative review. The avoidance of an arbitrary and capricious pronouncement of the death sentence has now been declared a constitutional mandate. It compels the trier of fact to make specific findings with respect to the particular circumstances of a capital crime and the individual defendant. *Bell v. Ohio*, 438 U. S. 637, 98 S. Ct. 2977, 57 L. Ed. (2d) 1010 (1978); *Lockett v. Ohio*, 438 U. S. 586, 98 S. Ct. 2954, 57 L. Ed. (2d) 973 (1978); *(Stanislaus) Roberts v. Louisiana*, 428 U. S. 325, 96 S. Ct. 3001, 49 L. Ed. (2d) 974 (1976); *Woodson v. North Carolina*, 428 U. S.

280, 96 S. Ct. 2978, 49 L. Ed. (2d) 944 (1976); *Jurek v. Texas*, 428 U. S. 262, 96 S. Ct. 2950, 49 L. Ed. (2d) 929 (1976); *Proffitt v. Florida*, 428 U. S. 242, 96 S. Ct. 2960, 49 L. Ed. (2d) 913 (1976); *Gregg v. Georgia*, 428 U. S. 153, 96 S. Ct. 2909, 49 L. Ed. (2d) 859 (1976). In like manner, these cases encourage, while not mandating, an appellate review which accords priority to the particular and distinctive features of each defendant as well as the specific circumstances of the crime for which the death sentence has been imposed. The ultimate outcome, it is suggested by these decisions, should be the infliction of capital punishment upon only those individuals who have been culled from all other defendants by a process which highlights the unique attributes of their personalities and their crimes.

From a logical standpoint, of course, that which is unique is also incommensurable. Herein lies the conflict between particularized sentencing (and review) and the notion of comparing "similar cases." Clearly, a comparative review cannot be permitted to diminish the particularized quality of sentencing, since the latter is now an absolute command of the U. S. Constitution. By the same token, the final resolution of a given appeal, if sentence is to be affirmed, should rest upon the unique correctness of the result in the given instance rather than its course resemblance to other cases.

We find that the U. S. Supreme Court has implicitly recognized this tension in that it has carefully avoided imposing any model of appellate review upon the states. Most obvious is the fact that the Texas statute, scrutinized in *Jurek v. Texas, supra,* provided for no proportionality review whatever. Equally striking is the absence in either *Gregg v. Georgia, supra,* or *Proffitt v. Florida, supra,* of any language elevating comparative proportionality review to constitutional prominence. We conclude that the proper balancing of particularized and comparative review, if any, has been left to the states as an "interstitial" matter not appropriate for federal constitutional resolution. "Developments in the Law — State Constitutions," 95 Harvard Law Review 1324, 1356 (1982).

Aside from the problematical nature of this balancing task, there may be other grounds for the apparent reluctance of the U. S. Supreme Court to impose a single model of appellate

review upon the states. Comity and diversity of state death penalty regimes present obvious difficulties, although they have not deterred rulings of sweeping effect in the past. *See (Stanislaus) Roberts v. Louisiana, supra; Woodson v. North Carolina, supra; Furman v. Georgia, supra.* By way of example, we note that § 16-3-25(C) of the Code, bears a strong resemblance to GA. CODE ANN. § 27-2537(c) (Supp. 1975), which was challenged and discussed in *Gregg v. Georgia, supra.* The South Carolina Code, however, does not specify the "universe" of similar cases as does § 27-2537(c) of the Georgia Code. Reading *Gregg v. Georgia, supra,* along with *Proffitt v. Florida, supra,* we must conclude that the U. S. Supreme Court has elected to allow diversity among the states to continue, at least in determining the scope of any comparative review.

Encouraging diversity among the states is, of course, a practice that comports well with the basic concept of federalism. It has been explicitly approved by the U. S. Supreme Court in the very setting of criminal law. Speaking for a unanimous Court in *Addington v. Texas,* 441 U. S. 418, 431, 99 S. Ct. 1804, 1812, 60 L. Ed. (2d) 323 (1979), Chief Justice Burger stated: "The essence of federalism is that states must be free to develop a variety of solutions to problems and not be forced into a common, uniform mold." In the same spirit is the "celebrated dictum" of Justice Brandeis in which the individual states were compared to laboratories of social and economic experimentation, a view taken on many occasions since it was first expressed in *New State Ice Co. v. Liebmann,* 285 U. S. 262, 311, 52 S. Ct. 371, 386, 76 L. Ed. 747 (1932) (dissenting opinion). *See Brooks v. Tennessee,* 406 U. S. 605, 617, 92 S. Ct. 1891, 1897, 32 L. Ed. (2d) 358 (1972) (Burger, C. J., dissenting); *Duncan v. Louisiana,* 391 U. S. 145, 193, 88 S. Ct. 1444, 1472, 20 L. Ed. (2d) 491 (1968) (Harlan, J., dissenting); *Fay v. New York,* 332 U. S. 261, 296, 67 S. Ct. 1613, 1631, 91 L. Ed. 2043 (1947) (Opinion of Jackson, J.).

Imposition upon the states of a single design for proportionality review would represent a massive intrusion upon the integrity of state governments within the federal scheme. We cannot assume that the United States Supreme Court would take such a step by mere implication or inadvertence. Rather, we believe such a dramatic curtailment of state autonomy

would be openly announced and most likely heralded by decisions preparing a foundation.

Neither formal announcement nor suggestive precedent reveals itself in any of the post-Furman decisions.

The due process clause of the Fourteenth Amendment to the U. S. Constitution does not even require states to provide appellate review, as was indicated in *Ortwein v. Schwab*, 410 U. S. 656, 661, 93 S. Ct. 1172, 1175, 35 L. Ed. (2d) 572 (1973), citing a line of prior decisions including *Lindsey v. Normet*, 405 U. S. 56, 77, 92 S. Ct. 862, 876, 31 L. Ed. (2d) 36 (1972); *Griffin v. Illinois*, 351 U. S. 12, 18, 76 S. Ct. 585, 590, 100 L. Ed. 891 (1956); *District of Columbia v. Clawans*, 300 U. S. 617, 627, 57 S. Ct. 660, 663, 81 L. Ed. 843 (1937); *McKane v. Durston*, 153 U. S. 684, 14 S. Ct. 913, 38 L. Ed. 867 (1894). We find no suggestion that, where state appellate review is granted, the U. S. Supreme Court has mandated any particular mode of conduct, to say less of ruling any mode unconstitutional. Likewise there is no hint that the doctrine of equal protection requires comparative review at the state level. Indeed the application of an equal protection analysis would take the Supreme Court of the United States into the very process of defining "similar cases" which it has declined to enter heretofore. The existence of similarly situated persons is after all a logical precondition for denial of equal protection.

As indicated above, none of the Eighth Amendment decisions following *Gregg v. Georgia, supra,* have imposed or suggested a preferred method of state appellate review. In the final analysis, it appears that the U. S. Supreme Court itself looks only to the ultimate result, which is preventing the imposition of excessive and disproportionate punishment upon the individual petitioner. In *Coker v. Georgia*, 433 U. S. 584, 97 S. Ct. 2861, 53 L. Ed. (2d) 982 (1977) the U. S. Supreme Court vacated a "disproportionate" sentence of death for the crime of rape. In its opinion, the Court made no mention of the Georgia appellate process. While the Court conducted a modified "proportionality review" of its own, the ultimate result was reached independently for, in the words of Justice White, "the Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." 433 U. S. at 598, 97 S. Ct. at 2869. *See*

*also Enmund v. Florida, supra.* Another arguably dispropor-
tionate sentence was vacated in *Godfrey v. Georgia,* 446 U. S.
420, 100 S. Ct. 1759, 64 L. Ed. (2d) 398 (1980). The U. S. Su-
preme Court there devoted some attention to actions by the
Supreme Court of Georgia. The basis of the decision, however,
was not the matter of review but the overly broad reading
which Georgia had given to one of its statutory aggravating
circumstances. It is thus apparent that the Eighth Amend-
ment to the U. S. Constitution does not mandate any mode of
appellate review, or even appellate review as such, but only an
outcome. That outcome, again, is a penalty imposed on a
meaningful basis which can be sustained as neither excessive
nor disproportionate in light of the crime and the defendant.

We conclude from the foregoing that the contours of pro-
portionality review, where it exists, have been left to state
determination since the U. S. Supreme Court has declined to
impose any specific model of review upon the states.
§ 16-3-25(C) of the Code represents an act of legislative grace
by the General Assembly which we are required to interpret
in accordance with sound rules of statutory construction.

In our view, the search for "similar cases" can only
begin with an actual conviction and sentence of death
rendered by a trier of fact in accordance with § 16-3-20
of the Code. We consider such findings by the trial court to be
a threshold requirement for comparative study and indeed
the only foundation of "similarity" consonant with our role as
an appellate court.

We recognize that in some jurisdictions and commentaries
it is felt that the reviewing court should compare a given
death sentence with a "universe" of cases which includes
sentences of life imprisonment, acquittals, reversals and even
mere indictments and arrests. Under such a regime, the re-
viewing court could only determine the size of its sample or
"universe" by some arbitrary device. Fact findings of the trial
court, by contrast, provide a fundamental line of demarcation
well recognized in and even exalted by our legal tradition. The
decisive importance of such findings is evidenced by the lan-
guage of Article V, section 5, South Carolina Constitution,
which limits our review to "correction of errors at law" in all
but equity cases.

To expand the notion of a "universe" would also entail

intolerable speculation by this Court. Under the South Carolina statute, a jury is not required to state its reasons for failing to recommend a sentence of death. In a given case, the alleged aggravating circumstance may not have been proven to the satisfaction of the jury, while in another "similar case" (expansively defined) the statutory mitigating circumstances or some mitigating factor "otherwise authorized or allowed by law" may have deterred imposition of the death sentence.

This Court would enter a realm of pure conjecture if it attempted to compare and contrast such verdicts with an actual sentence of death. They represent acts of mercy which have not yet been held to offend the United States Constitution. Moreover, they reflect the emphasis upon individualized sentencing mandated by the United States Supreme Court. We will not subject these verdicts to scrutiny in pursuit of phantom "similar cases," when a meaningful sample lies ready at hand in those cases where the jury has spoken unequivocally.

It is axiomatic, of course, that a death sentence infected by prejudicial trial error is a nullity which must be categorically rejected from any comparative review of properly imposed death sentences. Thus our prior decisions vacating and remanding death sentences for retrial must be disregarded in the course of proportionality review. *State v. Truesdale, supra; State v. Patterson*, 278 S. C. 319, 295 S. E. (2d) 264 (1982); *State v. James Anthony Butler*, 277 S. C. 543, 290 S. E. (2d) 420 (1982); *State v. Woomer*, 277 S. C. 170, 284 S. E. (2d) 357 (1981); *State v. Plath, supra; State v. Adams, supra; State v. Linder, supra; State v. Woomer*, 276 S. C. 258, 277 S. E. (2d) 696 (1981); *State v. Goolsby, supra; State v. Tyner, supra*.

It is of no consequence that the South Carolina "universe" has consisted of only five cases to this date. *State v. Shaw, supra*, presented the first occasion for proportionality review under our current statute. We noted then that no similar cases existed, but the sentence imposed was none the less appropriate and neither "excessive" nor "disproportionate" considering the crime and the defendants. Indeed, a comparable crime involving multiple murder by two or more accomplices, in the course of armed robbery, kidnapping and rape, attended by unspeakable cruelty and mutilation, has yet to come before

this Court. *Shaw*, thus, constitutes a category unto itself.

In like manner, the succeeding three cases of *State v. Hyman, supra, State v. Gilbert, supra,* and *State v. Thompson, supra,* proved "similar" in only the most superficial manner — that is, the aggravating circumstance in each instance was armed robbery. The transcripts of these cases are public records, as pointed out in *Thompson, supra,* and when inspected reveal significant differences between them.

William Gibbs Hyman conspired with four other persons to rob two elderly brothers. The conspirators made their way at nightfall to the victims' home where stealth and deception were initially employed. Failing in their first foray, the conspirators applied violence. One of the victims was able to fire a shot from within before the home was stormed. From the testimony, a jury could have concluded that the decedent was killed by a shot-gun blast fired by Hyman at close range while the victim stood disarmed. It appears that everyone at the scene was intoxicated, but the defendant was sufficiently sober to continue demanding money while he beat the surviving brother with one of the two weapons involved. Mitigating testimony was offered by a clergyman as well as family members who related personal frustrations and tensions suffered by the defendant at some time before the killing. In addition, the defendant himself took the stand to express his remorse. The jury recommended a sentence of death and we affirmed, considering the penalty neither excessive nor disproportionate with respect to the crime and the defendant and notwithstanding the lack of any truly "similar" case to that point in time.

Larry Gilbert and J. D. Gleaton, brothers of whom Gleaton is the elder, robbed and murdered the operator of a filling station shortly after noon following a morning spent cruising in their automobile in search of (and possibly using) drugs. In the course of the robbery, the victim was savagely stabbed seven times as he struggled with Gleaton and was shot once by Gilbert. From the testimony, a jury could have inferred that the shot was fired while the victim lay on the floor of his business establishment. A witness testified that one of the assailants laughed at the victim in his agony, which testimony was sharply contested by defendants. Mitigating testimony was taken from a clergyman and the defendants' mother.

Gilbert and Gleaton in turn took the stand to state that they had acted on impulse and had intended no harm to the victim. The jury recommended death sentences, and we affirmed. The cases of State v. Shaw, supra, and State v. Hyman, supra, offered no assistance by way of comparison, particularly since the latter case had involved an elaborate, multiparty scheme to rob and the use of weapons by the robbery victims. In the crime of Gilbert and Gleaton, the deceased was unarmed and could only use his hands to ward off the repeated thrusts of the knife. We held the sentence of death to be neither excessive nor disproportionate considering the crime and the defendants.

Albert "Bo" Thompson shot and killed the proprietor of a small store in the course of a robbery. In fact the defendant shot his victim twice, the second time in the face from close range. Testimony of an accomplice indicated that the defendant, on the morning of the incident, had determined to rob someone somewhere and that one other store was reconnoitered before that of the victim was chosen. No mitigating testimony was offered, unlike the cases of Hyman, Gilbert and Gleaton. The jury was asked only to consider the defendant's age as well as a brief unsworn statement by him in the course of which he wept and asserted that the killing was an accident. Thompson's crime differed from those of Hyman, Gilbert and Gleaton in other respects, too. The latter defendants all offered some evidence of acting under the influence of alcohol or drugs, while Thompson inferably acted with a clear mind and cool deliberation. Thompson fired the fatal shots, it appears, after his accomplice left the store, whereas Hyman, Gilbert and Gleaton killed their struggling victims in the presence of others or one another. The jury could reasonably have concluded that Thompson acted alone in committing a senseless murder without even a pretext of justification. The jury recommended a sentence of death and, notwithstanding the lack of a truly "similar" case for guidance, this Court found the sentence neither excessive nor disproportionate with respect to the crime and the defendant. In the course of proportionality review, this Court examines the record through the eyes of the sentencing authority. In the case of Thompson, however, this Court could not avoid noting that we had previously affirmed his conviction for an armed

robbery occurring subsequent to this murder, one in which the defendant had again held a gun to the head of the robbery victim. *State v. Thompson*, 276 S. C. 616, 281 S. E. (2d) 216 (1981). At trial the State had no opportunity to offer this conviction in evidence, yet it clearly would have rebutted mitigating arguments under § 16-3-20(C)(b)(1) of the Code. We do not consider it amiss to recognize such information regarding an appellant in the course of our final proportionality review.

The remaining case of *State v. Horace Butler, supra,* involved the abduction, rape and murder of an eighteen-year-old girl as she left her place of employment after dark. The defendant offered his poor record in school, his youth, and the fact that he had a small child as mitigating evidence. We affirmed the conclusion of the jury that a sentence of death was neither excessive nor disproportionate in light of the defendant's character and his wanton crime. No truly "similar" case existed for comparison, and by the same token *State v. Butler, supra,* offers no guidance in the review of the instant appeal.

Unlike previous cases involving murder and armed robbery, this appeal arises from two separate atrocities occurring in a single night. Unlike Hyman, Gilbert, Gleaton and Thompson, appellants Copeland and Roberts were not content to terrorize and slay their victims where they found them but instead transported them to backroads execution sites. Two of the victims were brought down by gunfire as they sought to escape. Thus wounded, they were subsequently riddled with bullets as they lay on the ground. On the body of one, a series of post-mortem stab wounds was also inflicted.

Mitigating evidence for appellant Copeland was limited to the testimony of his former wife who vouched for the promptness of his alimony and child support payments. She also stated that she had never seen him do anything cruel. More extensive mitigating testimony was offered on behalf of appellant Roberts. Family members as well as a trained psychologist revealed that Roberts had suffered an unhappy childhood, problems in school, the recent traumatic slaying of a brother, drug abuse and injuries in fights and car accidents. Roberts was characterized as having an impulsive personality and being easily led by others. By way of the trial court's

charge to the jury, Roberts received the full benefit of the relevant statutory mitigating circumstances. In the end it is probable that the jury relied on the psychologist's own statement that Roberts' prognosis for "straightening up" was poor.

It is our conclusion that no "similar" case exists that ▮ would permit meaningful comparative review of these death sentences. In view of the facts set forth above, however, we are satisfied that the sentence of death imposed on each of these appellants was appropriate and neither excessive nor disproportionate in light of their crimes and their respective characters. The sentences are accordingly affirmed.

It should now be clear that proportionality review in South Carolina is first and foremost directed to the particular circumstances of a crime and the specific character of the defendant. Comparative review will be thereafter undertaken if possible. Without hazarding a prediction, we can imagine that the "universe" of similar cases will gradually expand in the fullness of time. At present, South Carolina has found the death penalty to be neither excessive nor disproportionate in six distinct cases: (1) where one or more defendants rob, abduct, rape and murder one or more victims in circumstances which starkly reveal the malignant character of the defendant or defendants; (2) where a victim, armed and defending himself, is slain by an intruding defendant who is himself armed (and possibly intoxicated) while engaged in robbing the deceased; (3) where two or more defendants, on impulse or even while intoxicated rob and murder an unarmed struggling victim in his place of business; (4) where a single defendant, alone with an unarmed and unresisting victim, robs and without mitigation whatever murders the deceased; (5) where a single defendant kidnaps, rapes and murders a victim; (6) where one or more defendants perpetrate multiple offenses by robbing, kidnapping and murdering one or more victims in each separate incident. As comparable cases arise, they will be reviewed against this background. As dissimilar circumstances may lead to affirmed sentences of death, new "classes" or types of capital cases will be added to the existing "pool."

In the foregoing construction of § 16-3-25(C) of the Code, this Court has paid particular attention to the reasoning adopted by three members of the U. S. Supreme Court, speaking through Justice White, in *Gregg v. Georgia, supra.* As he understood the proportionality function, it was to serve as a mechanism to monitor imposition of death sentences within "classes" or "types" of crimes, those "classes" and "types" being determined by the statutory aggravating circumstances in a given state scheme. 428 U. S. at 223-224, 96 S. Ct. at 2948-2950. In a concluding passage, Justice White in essence stated the philosophy underlying our definition of "similarity" as he answered complaints that the Georgia statute permitted unconstitutional acts of discretion:

> Petitioner's argument that there is an unconstitutional amount of discretion in the system which separates those suspects who receive the death penalty from those who receive life imprisonment, a lesser penalty, or are acquitted or never charged, seems to be in final analysis an indictment of our entire system of justice. Petitioner has argued, in effect, that no matter how effective the death penalty may be as a punishment, government, created and run as it must be by humans, is inevitably incompetent to administer it. This cannot be accepted as a proposition of constitutional law. Imposition of the death penalty is surely an awesome responsibility for any system of justice and those who participate in it. Mistakes will be made and discriminations will occur which will be difficult to explain. However, one of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder.

§ 16-3-910 of the Code provides that one shall suffer the punishment of life imprisonment for kidnapping unless sentenced for murder as provided in § 16-3-20. Since appellants were sentenced for murder, as provided in § 16-3-20, their sentences of life imprisonment for kidnapping are vacated. Their convictions and sentences are otherwise affirmed. A search of the entire record reveals no other error.

Affirmed.

LEWIS, C. J., and LITTLEJOHN, NESS and HARWELL, JJ., concur.