26 P.3d 492

**STATE of Arizona, Appellee.**

v.

**James Cornell HARROD, Appellant.**

No. CR–98–0289–AP.

Supreme Court of Arizona,
En Banc.

July 16, 2001.

Janet Napolitano, Attorney General, by Kent E. Cattani, Chief Counsel, Capital Litigation Section and Monica Beerling Klapper, Assistant Attorney General, Phoenix, Attorneys for the State of Arizona.

James J. Haas, Maricopa County Public Defender, by James H. Kemper and Christopher Johns, Deputy Public Defenders, Phoenix, Attorneys for James Cornell Harrod.

## OPINION

MARTONE, Justice.

¶ 1 A jury convicted James Cornell Harrod of premeditated murder and felony murder. The trial court sentenced him to death. Appeal to this court is automatic under Rules 26.15 and 31.2(b), Ariz. R.Crim. P., and direct under A.R.S. § 13–4031. We affirm.

## I. BACKGROUND

¶ 2 At the time of his death, Ed Tovrea Sr. had an estimated net worth of $6 million. He left a significant portion of this estate outright to his wife, Jeanne Tovrea. The rest of the estate, valued at approximately $3.9 million, was put into a trust. During the remainder of her life, Jeanne was the beneficiary of the income from this trust. Upon Jeanne's death, the residuary was to go to Ed Sr.'s three children, including his son, Ed Jr. (who was known by the nickname "Hap").

¶ 3 Sometime in 1987, Jeanne Tovrea began to receive phone calls from Gordon Phillips, who claimed to be a stringer for Time Life Publications, and who said that he was interested in Ed Sr.'s days as a prisoner of war. Because Jeanne was suspicious of the persistent caller, she asked a friend, who was a retired CIA agent, to investigate Gordon Phillips. His inquiries were fruitless.

¶ 4 On July 11, 1987, Jeanne met with Phillips in Newport Beach, California. Deborah Nolan Luster, Jeanne's daughter, was present and spoke with Phillips for 30 to 45 minutes. Neither Nolan Luster nor Jeanne met with Gordon Phillips again.

¶ 5 Between midnight and 1 a.m. on April 1, 1988, a burglar alarm went off in Jeanne's house in Phoenix. When the police arrived, they found that a piece of glass and a rubber seal had been removed from the window above the kitchen sink. Jeanne was found in her bed. She had been shot in the head five times. Three of the shots had been fired through a pillow.

¶ 6 Although the house was protected by more than one burglar alarm, the window above the kitchen sink was the only point of entry that was not connected to an alarm. The police determined that the alarm had been set off when the intruder left through the arcadia door. Eighteen of the fingerprints found on or around the window and the counter below it were Harrod's.

¶ 7 On April 19, 1988, while cleaning Jeanne's home, Nolan Luster's husband discovered a micro-cassette tape containing a phone message from Gordon Phillips. He gave the tape to the police the next day. In May 1991, Nolan Luster attended a photographic lineup which did not include a picture of Harrod. She did not identify anyone as Phillips.

¶ 8 On April 15, 1992, the television program *Unsolved Mysteries* ran a piece on the murder featuring the answering machine message from Gordon Phillips. Harrod's then brother-in-law, Curt Costello, recognized the voice as Harrod's. Curt taped a rerun of the episode and sent copies to his brother Mark Costello, and his sister, Anne Costello (Harrod's wife at the time). He also sent a copy to Jeff Fauver, a friend who was a former FBI agent and who was then working as a criminal investigator for the United

States Department of Defense. All three of the recipients knew Harrod well and recognized the voice on the tape as Harrod's. Fauver called the police anonymously on December 9, 1993.

¶ 9 In November 1994, Anne Costello contacted the police through her lawyer. She was granted immunity from prosecution on condition that she was not a participant in the murder and was completely truthful during the investigation. Shortly thereafter, the police prepared a photographic lineup containing Harrod's picture. Nolan Luster did not identify anyone as Gordon Phillips.

¶ 10 Harrod was arrested on September 14, 1995, after the police matched his fingerprints to those at the crime scene. On December 19, 1996, Nolan Luster positively identified Harrod at a live lineup. Telephone records showed that during the months preceding the murder over 1,500 phone calls had been made between Harrod and Hap, and that 52 of those calls took place the day before the murder. Hap had sent over $35,000 to Harrod in various amounts.

¶ 11 At trial, the state claimed that Hap had arranged to pay Harrod $100,000 to murder Jeanne so that Hap and his siblings could take under the trust.[1] Harrod testified in his own defense, stating that he never posed as Gordon Phillips, met Jeanne, left messages on her answering machine, or broke into her home. He denied murdering Jeanne or participating in the murder in any way. He also suggested that the fingerprints at the scene identified as his had been created with a prosthetic fingerprint glove. He claimed that his relationship with Hap involved business ventures in China. He denied ever discussing the murder with his wife, Anne Costello. On rebuttal, Anne Costello testified that Harrod had told her extensively about his involvement in the murder.[2]

¶ 12 Harrod was convicted of first degree murder and felony murder. The trial court

found that the pecuniary gain aggravating factor, A.R.S. § 13–703(F)(5), and three mitigating factors had been proven. Finding that the mitigating factors were not sufficiently substantial to call for leniency, the court sentenced Harrod to death.

## II. ISSUES

¶ 13 Harrod raises the following issues:

### A. TRIAL ISSUES
1. Did the trial court err in excluding third party culpability evidence?
2. Did the trial court err in finding that Nolan Luster had not been successfully hypnotized and permitting her to testify about an identification she made of Harrod after the failed hypnosis session?
3. Did the trial court err in permitting Anne Costello to testify that she left him because she could not live with someone who could be involved in a murder?
4. Did the trial court err in permitting Harrod's ex-wife to testify about acts she observed and to impeach Harrod by testifying about otherwise privileged marital communications after he denied having such conversations?

### B. SENTENCING ISSUES
1. Did the trial court err in refusing to admit the results of a polygraph examination at the aggravation/mitigation hearing?
2. Is the Arizona death penalty statute unconstitutional on its face and/or as applied in this case?

## III. ANALYSIS

### A. TRIAL ISSUES
#### 1. Third Party Culpability Evidence
 ¶ 14 The trial court excluded evidence of a supposed confession by James

---

1. Hap told Harrod that he and his sisters hated Jeanne because she had limited their access to Ed Sr. during his final illness and was depleting the remaining assets with her new boyfriend.

2. For example, she said that: (1) Harrod had told her that he was familiar with the security system at Jeanne's house, including the fact that

the kitchen window was not on the system; (2) he left home at 9:00 p.m. the night of the murder and told her that he was going to watch the hit on Jeanne; and (3) at 2:00 a.m. the next morning, he returned home and told her that it was over.

Majors, a California death row inmate, that he killed Jeanne Tovrea. Majors purportedly confessed to Joe Calo, a fellow death row inmate. Calo pled guilty to a series of murders in exchange for a sentence other than death. Calo claimed that Majors was the trigger man in the murders to which Calo eventually pled guilty, and that Majors had also confessed to the murder of Jeanne Tovrea. But Calo's accounts of the Tovrea murder (as allegedly confessed by Majors) were inconsistent with each other and with the physical evidence found at the scene.[3] Police efforts to corroborate Majors' confession failed. When questioned, Majors denied involvement in the murder and denied making the confession.

¶ 15 Harrod contends that Majors' statement should have been admitted under the statement against penal interest exception to the hearsay rule. Rule 804(b)(3), Ariz. R. Evid., provides:

Rule 804. Hearsay Exceptions; Declarant Unavailable

. . . .

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witnesses:

. . . .

(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

██ ¶ 16 When a statement is offered to exculpate the defendant, the rule imposes

three requirements. First, the declarant must be unavailable. Rule 804(a), Ariz. R. Evid.; *see State v. Medina*, 178 Ariz. 570, 576, 875 P.2d 803, 809 (1994). Second, the statement must be so far against the declarant's interest that he would not have made it unless he believed it to be true. Third, corroborative circumstances must "clearly indicate the trustworthiness of the statement." Rule 804(b)(3), Ariz. R. Evid. The trial court must examine any evidence that corroborates or contradicts the statement to find whether a reasonable person could conclude that the statement is true. *State v. LaGrand*, 153 Ariz. 21, 28, 734 P.2d 563, 570 (1987).

¶ 17 Harrod offered no evidence that Majors would have refused to testify had he been called. He asserts that a person on death row in California would not come to Arizona to admit another murder. At the hearing on the motion to preclude, defense counsel stated: "We don't at this stage know whether or not Mr. Majors would be available to testify." Tr. Nov. 7, 1997, at 130. Because he made no affirmative showing that Majors would have refused to testify if called, Harrod failed to show that Majors was "unavailable" within the meaning of Rule 804(b)(3). *Cf. LaGrand*, 153 Ariz. at 27, 734 P.2d at 569; *State v. Henry*, 176 Ariz. 569, 575, 863 P.2d 861, 867 (1993) (declarant was legally unavailable because of showing that declarant would have asserted his Fifth Amendment privilege if called to testify); *State v. Thoma*, 313 Or. 268, 834 P.2d 1020, 1025 (1992) (under analogous rule, where defendant made no showing that declarant would invoke the Fifth Amendment privilege or that incarceration prevented him from testifying, declarant was not legally unavailable).[4]

¶ 18 Even if Harrod had shown that Majors was unavailable for the purposes of Rule 804, the statement was properly excluded because it was not trustworthy. There was

---

**3.** For example, Majors supposedly stated that he shot Tovrea once, but she had been shot five times; he claimed to have shot her in one room before moving her into the bedroom, but the evidence showed that she was shot in her bed.

**4.** That Majors was imprisoned in another state is insufficient to show unavailability. Majors could

have been summoned under A.R.S. § 13-4093. *See, e.g., State v. Medina*, 178 Ariz. 570, 572 n. 5, 875 P.2d 803, 805 n. 5 (1994); *State v. Brady*, 122 Ariz. 228, 230-31, 594 P.2d 94, 96-97 (1979) (California's reciprocal law permits summoning declarant incarcerated in California).

**314**

no evidence that Majors was at the crime scene. The details of the statement were inconsistent with the crime, and Majors himself denied involvement. *See LaGrand*, 153 Ariz. at 27, 734 P.2d at 569 (finding that trustworthiness of 804(b)(3) statement is negated by contradictory evidence and lack of corroborating evidence). For these same reasons, the Majors confession did not meet the "inherent tendency" requirement of *State v. Fulminante*, 161 Ariz. 237, 252, 778 P.2d 602, 617 (1988).

¶ 19 Relying on *Chambers v. Mississippi*, 410 U.S. 284, 298, 93 S.Ct. 1038, 1047, 35 L.Ed.2d 297 (1973), Harrod argues that the exclusion of the Majors confession denied him the right to present a defense. But in *LaGrand* we noted that the Court in *Chambers* was strongly persuaded by the demonstrated reliability of the proffered statements. 153 Ariz. at 29, 734 P.2d at 571. We found that by applying the test for corroboration under Rule 804(b)(3), the hearsay rule was not applied mechanistically and the exclusion of an unreliable third party confession did not violate the defendant's right to present a defense. So too, we hold that the exclusion of the Majors' confession did not deny Harrod the right to present a defense. There was no error in excluding it.

### 2. The Post–Hypnotic Testimony

¶ 20 On March 14, 1990, Nolan Luster submitted to an attempt at hypnosis to enhance her recall of Gordon Phillips for the purpose of creating an investigatory sketch. The attempt at hypnosis was unsuccessful and no sketch was produced. In December 1996, Nolan Luster selected Harrod from a live lineup as Gordon Phillips.

¶ 21 Harrod moved to exclude Nolan Luster's post-hypnotic identification of Gordon Phillips. The state argued that Nolan Luster had never been successfully hypnotized. The state offered testimony by the hypnotist and an additional expert that Nolan Luster had not succumbed to hypnosis. Harrod's expert was generally equivocal, and testified that "it [wa]s almost equally possible that she was or wasn't hypnotized, that being pressed for which, I would say it is more likely that

she in fact was hypnotized." Tr. Oct. 10, 1997, at 9–13.

¶ 22 The trial court found by a preponderance of the evidence that Nolan Luster had not been hypnotized. It did state, however, that if the standard were clear and convincing evidence, it would not have so found. Based on its finding, the court admitted Nolan Luster's identification testimony.

¶ 23 Because witnesses may testify only to matters recalled and recorded before hypnosis, *State v. Mena*, 128 Ariz. 226, 232, 624 P.2d 1274, 1280 (1981), if the state failed to prove that Nolan Luster had not been successfully hypnotized, it would have been error to permit her to testify about the later identification, *State v. Lopez*, 181 Ariz. 8, 9, 887 P.2d 538, 539 (1994).

¶ 24 In *State v. Stolp*, 133 Ariz. 213, 215, 650 P.2d 1195, 1197 (1982), we declined to "establish a burden of proof for the state to meet when it asserts that one of its witnesses subjected to a hypnotic session was in fact never hypnotized."

¶ 25 At least one other court has addressed the issue of the proper standard for determining whether a witness was successfully hypnotized. *People v. Romero*, 745 P.2d 1003 (Colo.1987). Squarely presented with the issue, the *Romero* court determined that unsuccessful hypnosis must only be shown by a preponderance of the evidence. *Id.* at 1016. Because this is consistent with the typical standard for preliminary questions of fact, *see* Rule 104(a), Ariz. R. Evid., we agree with *Romero* that the standard is a preponderance of the evidence.

¶ 26 Because the proper standard was applied and the court's finding was based on its credibility determinations, we give great deference to the trial court's finding. The trial court found by a preponderance of the evidence that Nolan Luster had not been successfully hypnotized. After reviewing the record, we agree. Nolan Luster was properly permitted to testify about the subsequent identification.

### 3. Anne Costello's Testimony

¶ 27 In his case-in-chief, Harrod suggested that his ex-wife and her family were

lying about Harrod's involvement in the murder because of bitterness over their divorce. On rebuttal, the state asked Anne Costello why she divorced Harrod. The defense objected on the basis of relevance. The state argued that her testimony was relevant to show that Anne Costello was not testifying because of any animus she harbored toward Harrod, thus rebutting the suggestion raised by the defense. The objection was overruled. She said:

> I left him because I couldn't live with him because of this terrible thing that he had done, because I couldn't stand the fact that I was living with someone that could be involved with a murder.

Tr. Nov. 14, 1997, at 28. Harrod now claims that it was error to permit Anne Costello to opine on the ultimate issue.

¶ 28 There was no error. First, Harrod opened the door to this testimony. Second, this was not opinion testimony at all. Anne Costello's testimony was not her bald opinion of Harrod's guilt or innocence. Her testimony was based on what Harrod had told her or done in her presence. *See* Rules 602, 701, 704, Ariz. R. Evid. There was no error in admitting it.

### 4. Marital Privilege
#### a. Case–in–Chief

¶ 29 The state moved for an order to allow Anne Costello to testify about statements Harrod made to her regarding the plot to kill Jeanne Tovrea. The court denied the motion, finding that the conversations were protected by the marital communications privilege. The court did, however, permit Anne Costello to testify to everything she "observed, overheard or did with [the] defendant in relation to this case." Minute Entry Oct. 9, 1997, at 21. Harrod challenges this ruling arguing that certain of his acts were intended as confidential communications.

¶ 30 There are two marital privileges. A.R.S. § 13–4062(1) provides that:

> A person shall not be examined as a witness in the following cases:

1. A husband for or against his wife without her consent, nor a wife for or against her husband without his consent, as to events occurring during the marriage, nor can either, during the marriage or afterwards, without consent of the other, be examined as to any communication made by one to the other during the marriage.

¶ 31 The anti-marital fact privilege, which allows one spouse to prevent the other from testifying, terminates when the marriage is dissolved. *State v. Drury*, 110 Ariz. 447, 451, 520 P.2d 495, 499 (1974); *see also State ex rel. Woods v. Cohen*, 173 Ariz. 497, 502, 844 P.2d 1147, 1152 (1992). Because Anne Costello and Harrod were divorced long before trial, the anti-marital fact privilege does not apply.

¶ 32 The marital communications privilege protects confidential communications made between spouses while they are married and it survives the marriage. A.R.S. § 13–4062(1); *Drury*, 110 Ariz. at 453, 520 P.2d at 501.

¶ 33 Harrod contends that the receipt of Federal Express packages and the burning of a package were confidential marital communications and should have been protected by the privilege.[5] While the privilege protects all confidential communications, it protects neither non-confidential communications nor non-communicative acts. *Drury*, 110 Ariz. at 454, 520 P.2d at 502. We have expressly declined to extend the privilege from confidential verbal communications to acts, ruling that a spouse may not testify about the former, but may testify about the latter. *Id.*, 520 P.2d at 502; *see also Posner v. N.Y. Life Ins. Co.*, 56 Ariz. 202, 207, 106 P.2d 488, 491 (1940) (finding that a spouse "may testify as to what was *done* by either spouse, but not as to what was *said* if it was in the nature of a confidential communication" (emphasis in original)); Morris K. Udall, *Arizona Evidence* § 501.3 (4th ed. 2000) ("The communications privilege applies only to communications, not to other facts or

5. Harrod also argues that Anne Costello's testimony about a down payment on a house, payment of hotel bills, and the purchase of a car were confidential communications. However, all of these acts involved the presence of a third person. Because any communications made in the presence of a third person are not confidential, they are not privileged.

conduct, observed in confidence during the marriage."). In *Drury*, the defendant asked us to "extend the privilege to any confidential communication whether it be oral conversation or conduct." 110 Ariz. at 454, 520 P.2d at 502. Because "the privilege is an obstacle to the pursuit of truth," which "serves no real function in the reality of married life," we declined to do so and held that the privilege "should be limited rather than expanded." *Id.*, 520 P.2d at 502. Anne Costello's testimony on direct examination was limited to non-communicative acts she observed. There was no error.

### b. Rebuttal

¶ 34 At oral argument on the motion to admit Anne Costello's testimony, a second issue which the parties had not briefed arose: whether Harrod would waive the privilege by testifying about the conversations Anne Costello claimed he had with her. The court ultimately decided that if Harrod chose to testify about those conversations, he would waive the privilege with respect to "those areas where the ex-wife testifies dealing directly with that of the ... husband's." Tr. Nov. 7, 1997, at 126. Harrod flatly denied having any conversations with Anne Costello regarding the Tovrea murder.[6] Because her proposed testimony contradicted Harrod's, the court permitted the state to impeach him by allowing Anne Costello to testify on rebuttal about conversations she had with him about the murder.

¶ 35 Harrod argues that the trial court "abrogated" the privilege by judicially crafting an exception that does not appear in an otherwise clear and unequivocal statute. But the trial court did not find that the privilege did not apply. Rather, it found that Harrod waived the privilege. At the hearing on the issue, counsel stated:

---

**6.** On direct examination, counsel asked:
 Q: Did you ever talk to Mr. Tovrea during any of the time periods exhibited by these charts about killing his stepmother?
 A: I have never had a conversation with anyone regarding killing Mrs. Tovrea.
 Tr. Nov. 12, 1997, at 59–60.
 On redirect examination, counsel asked the following:

Now Judge, I don't mean to suggest there is—there isn't any way James could open the door to Anne's statements. Certainly if he gets up there and volunteers that he never discussed a thing with his wife, or that he specifically discussed this but didn't say what she claims he said, he has breached the privilege, and the State would be permitted certainly to cross-examine him on it and probably to call Anne to impeach him on it.

Tr. Nov. 7, 1997, at 115–16.

¶ 36 Later, referring to *Henderson v. State*, 583 So.2d 276, 293–94 (Ala.Crim.App. 1990), where the defendant took the stand and discussed the marital communication that he sought to prevent his wife from discussing, defense counsel stated:

Now that's exactly the kind of sword and shield situation that shouldn't be allowed to happen, and I have always acknowledged to the Court that I recognize that it will be my job as attorney and James' job as the witness, to not broach that subject. And if we do, we do at our own peril, but not the mere fact of taking the witness stand.

Tr. Nov. 7, 1997, at 119–20. Defense counsel was correct. In *Harris v. New York*, 401 U.S. 222, 225–26, 91 S.Ct. 643, 645–46, 28 L.Ed.2d 1 (1971), the Court held that prior inconsistent statements made without the benefit of *Miranda* warnings (and thus otherwise inadmissible) may be admitted to impeach the defendant. The trial court and the state analogized the waiver of the privilege to the *Harris* rule for un-Mirandized statements. We agree. While a defendant clearly has a right to rely on privileges, he does not have a right to fabricate on the stand and be immune from impeachment. *See id.* at 225, 91 S.Ct. at 645 ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from

---

 Q: Did you ever have any conversation with your wife, admitting to her, your involvement in your having [sic] any involvement in the Jeanne Tovrea homicide?
 A: No.
 Tr. Nov. 13, 1997, at 149.

the risk of confrontation with prior inconsistent utterances.").

¶ 37 The statutorily created marital communications privilege does not merit greater protection than the Fifth Amendment privilege. Harrod could have refused to take the stand or respond to questions about communications in order to ensure that his wife could not contradict his version of events. *See United States v. Benford,* 457 F.Supp. 589, 597 (E.D.Mich.1978) ("[W]hen the defendant attempted to take advantage of his wife's forced silence by testifying to things known only to himself and to her, he attempted to use the privilege for a purpose it was never meant to cover."). But once he testified, it was appropriate to allow the jury to hear Anne Costello's impeaching testimony. We therefore hold that where a witness testifies about otherwise privileged marital communications, or denies having relevant communications with his spouse, he waives the marital communications privilege with respect to those communications and may be impeached by his spouse's testimony.

## B. SENTENCING ISSUES

### 1. Exclusion of Polygraph Results

¶ 38 Harrod claims that the trial court erred by refusing to permit him to introduce at the aggravation/mitigation hearing evidence that he had passed a polygraph examination in which he denied guilt. He claims that the polygraph results should have been admissible under A.R.S. § 13–703(G), and also because they were relevant to any residual doubt the court had regarding his guilt. The state argues that because Harrod had no constitutional right to present residual doubt evidence, he had no corresponding right to present the polygraph evidence in support of residual doubt. It further contends that even though the court permitted Harrod to introduce evidence of residual doubt, the polygraph, which is per se unreliable, was not admissible pursuant to Rule 26.7, Ariz. R.Crim. P.

¶ 39 We need not reach any of these arguments because even had the polygraph results been admitted, they would not have altered the sentence imposed. The trial court made clear that "the *court* does not have any lingering doubt as to the defendant's role or participation in the murder of Jeanne Tovrea." Spec. Verd. at 12 (emphasis in original). Moreover, the trial court stated that "while this court has previously ruled [the polygraph results] inadmissible, both at trial and in these proceedings, it is well aware of the results." *Id.* We agree with the trial court.[7]

---

7. The role of residual doubt and the admissibility of polygraph results at capital sentencing hearings are far more complex issues than made out by Justice Feldman's concurrence.

 If residual doubt is a mitigating circumstance that the defendant must prove by a preponderance of evidence, the aggravation/mitigation hearing could turn into an attack on the judgment of conviction itself. Several courts have rejected residual doubt as a mitigating factor because it would spawn a retrial on the guilt phase without the constraints imposed by the rules of evidence. *See, e.g., Stockton v. Commonwealth,* 241 Va. 192, 402 S.E.2d 196, 206–07 (1991); *State v. Goff,* 82 Ohio St.3d 123, 694 N.E.2d 916, 923 (1998), *cert. denied,* 527 U.S. 1039, 119 S.Ct. 2402, 144 L.Ed.2d 800 (1999); *People v. Hooper,* 172 Ill.2d 64, 216 Ill.Dec. 633, 665 N.E.2d 1190, 1196 (1996); *Bussell v. Commonwealth,* 882 S.W.2d 111, 115 (Ky.1994). On the other hand, conviction beyond a reasonable doubt is not beyond all doubt. While beyond a reasonable doubt may be an adequate standard for the guilt phase of a capital case, absolute certainty may be a more appropriate standard for the imposition of the death penalty. As a practical matter, any trial judge who entertains any doubt about the defendant's guilt, even though not sufficient to warrant a new trial under Rule 24.1, Ariz. R.Crim. P., is likely to sentence the defendant to a life term under A.R.S. § 13–703(A).

 Even if we were to conclude that residual doubt is a mitigating circumstance that the defendant may prove, we are still left with the issue of the admissibility of polygraph evidence. We have long held it to be inadmissible under the *Frye* standard. *See State v. Ikirt,* 160 Ariz. 113, 115, 770 P.2d 1159, 1161 (1989); *State v. Valdez,* 91 Ariz. 274, 280, 371 P.2d 894, 900 (1962). We also have held that the reliability requirement of Rule 26.7(b), Ariz. R.Crim. P., requires the exclusion of polygraph evidence at a pre-sentencing hearing. *State v. Zuck,* 134 Ariz. 509, 514, 658 P.2d 162, 167 (1982). Other courts have held polygraph results inadmissible at capital sentencing hearings. *See People v. Pecoraro,* 175 Ill.2d 294, 222 Ill.Dec. 341, 677 N.E.2d 875, 886 (1997); *Paxton v. State,* 867 P.2d 1309, 1323 & n. 3 (Okla.Crim.App.1993); *State v. Copeland,* 278 S.C. 572, 300 S.E.2d 63, 69 (1982).

 The point, of course, is that complex questions over which the court may not be of one mind are

### 2. Judicial Fact Finding

¶ 40 Harrod argues that the decision in *Jones v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), draws into question the continuing validity of the Supreme Court's decision in *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). He argues that the aggravating factors that the judge finds under Arizona law are really elements of the offense which must be found by a jury. The state argues that *Walton* has not been expressly overruled and that *Jones* expressly distinguished *Walton* as a case in which aggravating factors serve as standards to guide a judge's choice between life and death.

¶ 41 After the briefs were filed in this case, the Supreme Court decided *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The Court struck down a New Jersey statute that allowed the trial court to make a factual finding (regarding hate) that would extend the term of imprisonment beyond the statutory prescription for the underlying offense. The Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. at 2362–63. The Court again distinguished *Walton* and specifically said "this Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death." *Id.* at 496, 120 S.Ct. at 2366.

¶ 42 Justice O'Connor dissented from the Court's holding and its attempt to distinguish *Walton.* She noted that "[a] defendant convicted of first-degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists." *Id.* at 538, 120 S.Ct. at 2388 (O'Connor, J., dissenting).

¶ 43 A.R.S. § 13–1105(C) provides that "[f]irst degree murder is a class 1 felony and is punishable by death or life imprisonment as provided by § 13–703." Thus first degree murder is a capital offense. But it is also the case that a death sentence cannot be imposed unless the trial court makes a factual finding that an aggravating circumstance exists. A.R.S. § 13–703(B) provides that, after a separate sentencing hearing, "[t]he court alone shall make all factual determinations required by this section." A.R.S. § 13–703(E) provides that "[i]n determining whether to impose a sentence of death or life imprisonment, the court shall take into account the aggravating and mitigating circumstances included in subsections F and G of this section and shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in subsection F of this section and that there are no mitigating circumstances sufficiently substantial to call for leniency."

¶ 44 Harrod's argument notwithstanding, this is not a debate for us to resolve. Article VI of the Constitution of the United States provides that the Constitution and laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby." We are thus bound to follow *Walton* unless the Supreme Court overrules it. *See Agostini v. Felton,* 521 U.S. 203, 237, 117 S.Ct. 1997, 2017, 138 L.Ed.2d 391 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."); *see also Hoffman v. Arave,* 236 F.3d 523 (9th Cir.2001); *Mills v. Moore,* 786 So.2d 532 (Fla.2001). We therefore reject Harrod's argument.

### 3. Independent Review

¶ 45 The jury unanimously found Harrod guilty of both premeditated murder and felony murder. The trial court found that the state had proven beyond a reasonable doubt the statutory aggravating factor in A.R.S. § 13–703(F)(5): that the murder was committed as consideration for the receipt of pecuniary gain.

best addressed in a case in which they could affect the outcome.

¶ 46 Harrod failed to prove by a preponderance of the evidence any of the statutory mitigating factors. However, Harrod proved by a preponderance of the evidence the following non-statutory mitigating factors: lack of criminal record, adjustment to incarceration, and family issues. The trial court considered all of the mitigating factors individually and cumulatively and found that they were insufficiently substantial to call for leniency.

### a. Pecuniary Gain

¶ 47 The state must prove beyond a reasonable doubt that receiving something of value was "a motive, cause or impetus [for the murder] and not merely the result." *State v. Spencer,* 176 Ariz. 36, 43, 859 P.2d 146, 153 (1993).

¶ 48 The trial court based its finding of pecuniary gain on the facts that: 1) Anne Costello testified that Harrod told her that Hap wanted Jeanne dead so that he and his siblings could access their inheritance; 2) Anne Costello testified that Harrod told her that he would receive $100,000 for the murder and had complained to her that he had not yet received the total amount; and 3) the state introduced evidence of wire transfers and checks from Hap to Harrod totaling approximately $35,000. We agree with the trial court that this aggravating factor was proven beyond a reasonable doubt. This was a murder for hire, not a robbery gone bad. Thus this factor is entitled to great weight.

### b. Statutory Mitigating Factors

¶ 49 Harrod argued and presented evidence in support of the mitigating factors found in A.R.S. §§ 13–703(G)(3) (minor participation) and (G)(5)(age). The trial court found that "the evidence presented at trial showed beyond a reasonable doubt that defendant was a major participant in the murder," Spec. Verd. at 9, and thus (G)(3) was not proven. We agree.[8]

¶ 50 The trial court found that Harrod's age at the time of the crime (34), coupled

with the fact that he "was a mature, married man, who had been living an adult lifestyle for many years" militated against mitigation. *Id.* at 10. Additionally, the court found that the murder "was not an act of youthful impulsivity, but rather, was planned and deliberate, taking place over a period of months." *Id.* Thus (G)(5) was not proven. We agree.

### c. Non–Statutory Mitigating Factors

¶ 51 Harrod offered the following non-statutory mitigating factors: 1) lack of criminal record; 2) adjustment to incarceration, including good behavior and assisting detention officers; 3) family issues including mutual love and support of family and the failure of defendant's biological father to participate in his life; 4) lingering doubt as to his role or participation in the crime; and 5) disproportionate sentence in relation to other cases and to others involved in this crime.

¶ 52 Harrod proved by a preponderance of the evidence that he had no prior criminal record, except for a self-reported misdemeanor conviction for marijuana possession in 1976. This was found to be a mitigating factor, and we agree.

¶ 53 While the trial court agreed that Harrod's good behavior in prison was a mitigating factor, it gave it minimal weight because good behavior is expected of all inmates. We agree.

¶ 54 The trial court found that the absence of Harrod's biological father was not a mitigating factor because there was no evidence that his absence had any causal relationship to Harrod's participation in the murder. We agree. The court also gave minimal weight to his supportive family. We agree.

¶ 55 The court made it very clear that it did not have any lingering doubt about Harrod's guilt. *Id.* at 12–13. We agree with that finding, and thus need not reach the question of whether residual doubt is a mitigating factor which a defendant must prove.

---

8. As to the felony murder finding, the trial court found, as permitted by *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), that *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), have been satisfied. Spec. Verd. at 15. We agree.

¶ 56 Relying on *State v. Salazar,* 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992), the court rejected Harrod's argument that his sentence was disproportionate. The court also found that because no one else was charged in the Tovrea murder, there was no basis for comparing Harrod's sentence to that of another participant. We agree.

¶ 57 In summary, the court balanced the very strong (F)(5) aggravating factor against the mitigating factors of lack of criminal record, adjustment to incarceration, and family issues. The trial court found that the mitigating factors were not sufficiently substantial to call for leniency, and we agree.

## C. OTHER ARGUMENTS

¶ 58 The rest of Harrod's arguments are made for preservation purposes only. They have been considered and rejected. We list them here.

¶ 59 The Arizona death penalty is not per se cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *Gregg v. Georgia,* 428 U.S. 153, 186–87, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976).

¶ 60 The infliction of death by lethal injection is not cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. *State v. Hinchey,* 181 Ariz. 307, 315, 890 P.2d 602, 610 (1995).

¶ 61 The Arizona death penalty scheme does not fail to prevent arbitrary and capricious administration of death sentences. *State v. Greenway,* 170 Ariz. 155, 160, 823 P.2d 22, 27 (1991).

¶ 62 The Arizona death penalty statute is not unconstitutional even though it does not entitle a defendant to death qualify the sentencing judge. *State v. Gulbrandson,* 184 Ariz. 46, 72, 906 P.2d 579, 605 (1995).

¶ 63 The Arizona death penalty statute is not unconstitutional even though it shifts the burden of proving mitigating factors to the defendant. *Walton,* 497 U.S. at 649–51, 110 S.Ct. at 3055–56; *Gulbrandson,* 184 Ariz. at 72, 906 P.2d at 605.

¶ 64 The Arizona death penalty statute does not violate the Eighth and Fourteenth Amendments to the United States Constitution, nor does it violate Article 2, sections 4 or 15 of the Arizona Constitution. *Gulbrandson,* 184 Ariz. at 72, 906 P.2d at 605. The trial court must consider all relevant mitigation evidence, but the weight to be given such evidence rests in the judge's discretion. *See id.* at 69, 906 P.2d at 602.

¶ 65 A proportionality review of Harrod's death sentence is not required. *See id.* at 73, 906 P.2d at 606; *Salazar,* 173 Ariz. at 416, 844 P.2d at 574 (noting that "no statute requires or suggests proportionality reviews in death cases").

## IV. DISPOSITION

¶ 66 We affirm Harrod's conviction and the sentence of death.

CONCURRING: CHARLES E. JONES, Vice Chief Justice, RUTH V. McGREGOR, Justice.

JONES, Vice Chief Justice, specially concurring:

¶ 67 I concur in today's opinion and judgment but express a separate view on whether "residual doubt" may be invoked as a mitigating factor in the capital sentencing process. While residual doubt is not present in this case, I nevertheless believe that a cogent argument can be made in an appropriate case that residual doubt should be considered by the trial judge during the sentencing phase. In a capital case in which true residual doubt as to a defendant's actual guilt remains in the mind of the judge following a jury verdict of guilty beyond a reasonable doubt, it would seem advisable that the judge be allowed to consider such doubt, not as a factor bearing on guilt or innocence, but as a mitigating factor in deciding between the death penalty and a lesser sentence. Due consideration of the judge's lingering doubt at the appropriate time may benefit a civilized society in which justice and fairness are fundamental to the system.

¶ 68 Today's opinion acknowledges, and I agree, that the trial judge is able, if only by implication, to take residual doubt into account in weighing and measuring mitigating factors relevant to the sentence. But under

that scenario, the reader of the trial judge's Special Verdict may never know whether residual doubt did or did not play a role in the determination of the final sentence.

¶ 69 Here is the problem as I see it. Our capital sentencing statute addresses the admissibility and consideration of mitigating evidence. Yet the statute, while seemingly broad, does not expressly allow consideration of residual doubt either as a statutory or non-statutory factor. Its language refers to mitigating evidence of "any aspect of the defendant's *character, propensities or record and any of the circumstances of the offense.*" A.R.S. § 13–703(G) (emphasis added). These statutory references, in my opinion, would not include consideration of residual doubt by the trial judge.

¶ 70 As a concept, residual doubt is the narrow window of uncertainty that will arise not infrequently in the mind of the judge following a guilty verdict in a criminal prosecution where the prosecutor has satisfied the jury of a defendant's guilt beyond a reasonable doubt but has not established guilt to an absolute certainty. Mitigation evidence, on the other hand, both statutory and non-statutory, is defined by the statute and is concerned with a defendant's human character as it may relate to the offense charged. Residual doubt, normally, will not bear on an aspect of a defendant's character, propensities, or past record, and will not, *per se,* be a circumstance of the particular offense. Specifically, residual doubt will arise only with respect to sentencing where the trial judge in fact perceives uncertainty, not as to the verdict of the jury, but as to the absence of absolute evidence of guilt. Such concern will normally stem from the relative strength or weakness in the evidence introduced at trial, the manner in which evidence is presented, the credibility of trial witnesses, the trial strategy utilized by either side, or other circumstances arising at trial. It thus occurs to me that residual doubt, as discussed in the cases, and mitigation evidence, as referenced in § 13–703(G), are two quite different things.

¶ 71 Because I conclude that consideration of residual doubt at sentencing does not fall within the permissible scope of A.R.S. § 13–703(G), the defendant's residual doubt argument raises a question that is best addressed to the legislature.

FELDMAN, Justice, specially concurring.

¶ 72 I concur in the result and join much of the analysis. I write separately, however, because I cannot agree with the majority's analysis on the issue relating to admission of the ex-wife's testimony nor with its failure to dispose of two other issues that were raised and briefed. I also join in the majority exposition of the *Apprendi* issue and the discussion of Arizona's capital sentencing regime. *See* opinion at ¶¶ 40–44. But I do so in light of the more detailed explanation in *State v. Ring,* 200 Ariz. 267, 25 P.3d 1139 (Ariz.2001). The majority view of the issue is set forth in *Ring* and need not be repeated here. *See also State v. Gould,* 23 P.3d 801 (Kan.2001).

**A. The ex-wife's testimony**

¶ 73 The court finds no error in admitting the testimony of Harrod's ex-wife because that testimony "was based on what Harrod had told her or done in her presence." Opinion at ¶ 28. But nothing had been done in the ex-wife's presence; she was not a percipient witness and had never been at or near the scene.

¶ 74 What happened was this: the defense tried to establish the ex-wife's bias against Harrod by showing she divorced him. To rehabilitate its witness, the state asked her why she left her husband. She said she divorced him because she could not live with a "murderer." What she was obviously saying was that she could not live with someone who told her he had killed and who she therefore *thought* was a murderer. The statement was not offered for the truth that Harrod was a murderer and was not a statement of opinion as to Harrod's guilt; it merely described her state of mind, explaining why the ex-wife divorced Harrod. The door had been opened and the reason for the divorce had been made relevant when the defense tried to show bias by raising the issue of the divorce. I therefore concur in the court's conclusion that there was no error in admitting the ex-wife's testimony.

¶ 75 Hopefully, the majority agrees that a lay opinion of a defendant's guilt is inadmissible. We do not allow opinion evidence of guilt, even when it is offered by experts. *State v. Moran,* 151 Ariz. 378, 383, 728 P.2d 248, 253 (1986); *State v. Lindsey,* 149 Ariz. 472, 474, 720 P.2d 73, 75 (1986); *Fuenning v. Superior Court,* 139 Ariz. 590, 605, 680 P.2d 121, 136 (1983). There is even less reason to allow lay opinion of guilt. If Harrod's ex-wife had been at the scene and had first-hand knowledge, she could have testified to the facts she knew, but any statement of her belief that Harrod was guilty of the charge would not have been admissible. *See State v. Williams,* 133 Ariz. 220, 228, 650 P.2d 1202, 1210 (1982) ("generally a witness may not indicate his belief in defendant's guilt"); *State v. Lummus,* 190 Ariz. 569, 571–72, 950 P.2d 1190, 1192–93 (App.1998).

## B. Residual doubt

¶ 76 Harrod claims that residual doubt of his guilt should be considered as a mitigating factor. The state argued that Harrod has no right to present residual doubt evidence. The trial judge permitted such evidence but rejected any mitigation in this case, stating that, given all of the circumstances, he had no residual doubt.

¶ 77 Harrod claims that the trial judge erred in failing to find residual doubt. The majority shrinks to a plurality on this issue and agrees with the trial judge that there is no "lingering doubt" about Harrod's guilt. Opinion at ¶ 39. So do I. But the court then refuses to decide whether residual doubt can ever be a mitigating factor. Opinion at ¶¶ 38–39 and note 7. I believe it is time to make it clear to the bench and bar that residual doubt is a mitigating factor. With so much recent evidence that wrongful convictions occur, this seems a strange time to have to argue the issue. *See* BARRY SCHECK, PETER NEUFELD, & JIM DWYER, ACTUAL INNO-

CENCE 219–20 (2000) (giving several examples of death row inmates recently exonerated by DNA evidence). Unfortunately, the court's failure to grapple with the issue leaves the question unresolved in Arizona.

¶ 78 Residual doubt is not grounds for a new trial. Despite rhetoric about a thirteenth juror, so long as a verdict is supported by properly admitted evidence, a trial judge may not overturn it and grant a new trial, even if he or she has doubts about the jury's finding. *See Hutcherson v. City of Phoenix,* 192 Ariz. 51, 55, 961 P.2d 449, 453 (1998); *Anderson v. Nissei ASB Machine Co., Ltd.,* 197 Ariz. 168, 173, 3 P.3d 1088, 1093 (App. 1999); *Cano v. Neill,* 12 Ariz.App. 562, 569, 473 P.2d 487, 494 (1970). But it is one thing to say that a verdict will not be disturbed just because the judge disagrees with it and quite another to say that a judge should sentence a defendant to death even though the judge believes the jury might have made a mistake. Recent events have shown quite clearly that there have been all too many instances in which juries have found a defendant guilty and the convictions have been affirmed, only to have it later determined that the defendant was actually not the perpetrator. *See* Death Penalty Information Center, *Innocence: Freed From Death Row,* at http://www.deathpenaltyinfo.org/Innocent-list.html (last visited July 11, 2001) (listing death row exonerations from 1973–2001).[1]

¶ 79 As the Innocence Project at Cardozo School of Law has established, juries and judges do make mistakes, the results of which can be tragic. *See* SCHECK ET AL., *supra.*[2] Arizona is not immune. *See, e.g., State v. Youngblood,* 173 Ariz. 502, 844 P.2d 1152 (1993). *Youngblood,* though not a capital case, involved a serious crime in which the police failed to properly preserve potentially exculpatory evidence. Nevertheless, Youngblood was found guilty beyond a reasonable

---

1. For a case-by-case examination of sixty-eight death row inmates released because of wrongful convictions, *see* Death Penalty Symposium, *Prisoners Released From Death Rows Since 1970 Because Of Doubts About Their Guilt,* 13 T.M. COOLEY L.REV. 907 (1996).

2. A 1999 Innocence Project reconstruction of sixty-two United States exoneration cases deter-

mined the following factors prevalent in wrongful convictions: mistaken eyewitnesses 84%; informant/"snitch" error 21%; false confessions 24%; defense counsel error 27%; prosecutorial misconduct 42%; police misconduct 50%; tainted or fraudulent science 33%. *See* SCHECK ET AL., *supra,* at 246.

doubt, and his conviction was ultimately upheld by this court on a 3 to 2 vote.[3] Years later, advances in science permitted testing of what evidence remained. Those tests revealed that Youngblood, who served some seven years in prison, was not the perpetrator. The convictions were vacated in 2000. *See* Thomas Stauffer & Jim Erickson, *DNA Test Clears Tucsonan Convicted in Molestation,* Arizona Daily Star, Aug. 9, 2000, at A1 (county attorney "sorry" that Youngblood was "incarcerated for an offense for which he was not guilty"). If Youngblood's had been a capital case, it is possible he would have been executed despite the uncertainty about his guilt.

¶ 80 The saga of John Knapp provides another example of a near-execution. Knapp was originally convicted and sentenced to death for murdering his minor daughters via arson. *State v. Knapp,* 114 Ariz. 531, 562 P.2d 704 (1977). While incarcerated, Knapp once came within forty-eight hours of execution and was scheduled for execution a total of five times. *See* Death Penalty Symposium, *Prisoners Released From Death Rows Since 1970 Because Of Doubts About Their Guilt,* 13 T.M. COOLEY L.REV. 907, 948 (1996). He was released in 1987 after newly developed tests showed that the children could have set the fire playing with matches. *Id.* Knapp was eventually rearrested in 1990 and retried in 1991; the jury deadlocked, and, through a plea bargain, Knapp pleaded no contest to second-degree murder, gaining a sentence of time served and avoiding a fourth trial. *Id.* He was released in 1992. In light of the evidence and proceedings in the case, we do not know if Knapp was guilty; we do know that his execution would have been a miscarriage of justice.

¶ 81 What harm is done by showing mercy because there is a possibility of the defendant's innocence? Why need we run the risk of executing someone who may actually be innocent? Such a risk does not exist in most cases, but we can hypothecate many instances in which it would. Take, for instance, a case in which important evidence has been lost or misplaced, the circumstantial evidence is not strong, and the defendant's guilt is established for the most part by the testimony of one or two eyewitnesses. *See* Erica Beecher–Monas, *Blinded By Science: How Judges Avoid the Science in Scientific Evidence,* 71 TEMP. L.REV. 55, 93 (1998) ("Studies of proven cases of wrongful conviction indicate that eyewitness errors constitute the largest single factor in wrongful convictions"); *see also* SCHECK ET AL., *supra,* at 16–18, 32–34. Sometimes convictions are procured on the basis of testimony from a witness who is biased or who, like a "snitch" or a co-defendant who has made a deal with the state, has some reason to lay blame on the defendant. *See e.g. State v. Carriger,* 143 Ariz. 142, 692 P.2d 991 (1984) (affirming death sentence of defendant convicted on testimony of witness seeking immunity for an earlier burglary attempt). Carriger was sentenced to death in 1978, won a new trial in 1998, and was freed through a plea agreement with a sentence of time served. Richard Ruelas, *Time Opens Cell Door: Convicted Killer Now A Free Man,* Arizona Republic, Jan. 24, 1999, at B1.[4]

¶ 82 Two of our cases intimate if not hold that residual doubt is a mitigating circumstance. *See State v. Spears,* 184 Ariz. 277, 295, 908 P.2d 1062, 1080 (1996); *State v. Atwood,* 171 Ariz. 576, 653, 832 P.2d 593, 670

---

3. The conviction was reversed by our court of appeals in 1986. *See State v. Youngblood,* 153 Ariz. 50, 734 P.2d 592 (App.1986). After we denied review, the United States Supreme Court granted certiorari, vacated, and remanded to the court of appeals. *See Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The court of appeals again reversed, holding that although the United States Constitution does not require that the government preserve evidence that might prove innocence, the protections afforded by the Arizona Constitution's Due Process Clause are greater. *See State v. Youngblood,* 164 Ariz. 61, 790 P.2d 759 (App.1989). We then granted review, vacated the second court of appeals opinion, and affirmed Youngblood's conviction, with Chief Justice Feldman and Justice Zlaket concurring in part and dissenting in part. *See State v. Youngblood,* 173 Ariz. 502, 844 P.2d 1152 (1993).

4. It appears, also, that there may be some question as to the great weight we have placed on fingerprint evidence. *See* Malcolm Ritter, *Fingerprints May Face Challenge as Unscientific,* Arizona Daily Star, April 8, 2001, at A5.

**324**

(1992). The majority's language raises doubt where perhaps none exists.

¶ 83 Vice Chief Justice Jones discusses the question of residual doubt in his concurring opinion and concludes that "it would seem advisable that the judge be allowed to consider such doubt." Jones concurrence at ¶ 67. He believes, however, that "residual doubt, as discussed in the cases, and mitigation evidence as referenced in A.R.S. § 13–703(G), are two quite different things." Jones concurrence at ¶ 70. Thus, he concludes, residual doubt "does not fall within the permissible scope of A.R.S. § 13–703(G)," so that the question "is best addressed to the legislature." *Id.* at ¶ 71.

¶ 84 But in my view, the legislature has already addressed the question. The statute does not limit the mitigating circumstances just to those concerning "the defendant's character, propensities or record and any of the circumstances of the offense," as Vice Chief Justice Jones argues. *Id.* at ¶ 69. Instead, A.R.S. § 13–703(G) defines mitigating factors as "any factors ... which are relevant ... *including* any aspect of the defendant's character...." (Emphasis added.) Thus, the statute does not limit mitigation to evidence of the defendant's character and the circumstances of the offense but only provides examples for the operative, all-inclusive command to consider *any* factors relevant to sentencing. The trial judge's doubt about guilt is certainly relevant in determining whether to sentence to life or death.

¶ 85 In addition, the Eighth Amendment to the United States Constitution requires that the sentencer be permitted to consider any relevant information in deciding on the imposition of death. *See Buchanan v. Angelone,* 522 U.S. 269, 276, 118 S.Ct. 757, 761, 139 L.Ed.2d 702 (1998) ("In the selection phase, our cases have established that the sentencer may not be precluded from considering, and

may not refuse to consider, any constitutionally relevant mitigating evidence.") (citations omitted). One would assume that even in the maze of death penalty jurisprudence, considerations of possible actual innocence are relevant to sentencing.

¶ 86 Given this court's responsibility for overseeing capital cases, it is time to resolve the residual doubt issue. I therefore cannot agree with the court's policy of avoidance. Residual doubt, properly defined, should be considered a substantial mitigating circumstance, and the court should say so. Having been left in no doubt by the facts of this case, however, I concur in the majority's disposition.

## C. Polygraph testing

¶ 87 Harrod claims the trial judge erred, at the aggravation/mitigation hearing, by not permitting him to introduce evidence that he had passed a polygraph examination in which he denied participation in the crime.[5] Harrod claims the polygraph results should have been admissible under A.R.S. § 13–703(G) and also because they were relevant to any residual doubt the trial judge may have had regarding his guilt. The state objected on the grounds that the results were per se unreliable, that Harrod had no constitutional right to present residual doubt evidence, and thus had no corresponding right to present polygraph evidence in support of residual doubt. The trial judge rejected the evidence and refused to consider it, but he stated he was aware of it and that even if he had considered it, he would not have found any residual doubt.

¶ 88 We first held polygraph examination results inadmissible because they were per se unreliable in *State v. Valdez,* 91 Ariz. 274, 280, 371 P.2d 894, 898 (1962). Indeed, the *Frye* test, which we follow in this state, originated in a dispute about the unreliability

---

5. The relevant substantive questions posed to Harrod and his responses were:

 Q. Were you physically present when Jean Tovrea was killed?
 A. No.
 Q. Did you shoot Jean Tovrea?
 A. No.
 Q. Did you enter Jean Tovrea's home through the kitchen window on April 1, 1988?

 A. No.
 Q. Did you participate in any way in the killing of Jean Tovrea.
 A. No.
 Defendant's Motion to Admit Polygraph, filed September 17, 1997, Exhibit A, at 2.

of polygraph evidence. *See Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Much has happened in the eighty years since *Frye*. As a result, we have found that such evidence is reliable enough to be considered by courts if the parties so stipulate. *See State v. Ikirt*, 160 Ariz. 113, 115, 770 P.2d 1159, 1161 (1987). Even more has changed since *Ikirt*.

¶ 89 We must first look at the provisions of our rules and statutes. Under A.R.S. § 13–703(C), a defendant may offer "[a]ny information relevant to any mitigating circumstances included in subsection G of this section," regardless of its admissibility at trial. Given that questions about the extent of a defendant's participation in the crime are certainly relevant as circumstances of the offense, and noting that the statute does not require reliability or compliance with the rules of evidence but permits the offer of "*any information*," it would seem that the question is solved by our statutes. But even if we were to read a reliability requirement into the offer of mitigating evidence, I conclude that the court should receive and consider such evidence when dealing with the literal decision of life or death.

¶ 90 As a matter of common knowledge, polygraph evidence has developed to the point that it is used in industry's determination of hiring or firing, in law enforcement, by national security agencies such as the Central Intelligence Agency, the armed services' intelligence agencies, and the Federal Bureau of Investigation. John J. Canham, Jr., *Military Rule of Evidence 707: A Bright–Line Rule That Needs to be Dimmed*, 140 MIL. L. REV. 65, 84–85 (1993); 1 AM.JUR. *Trials* § 38, at 481 (1965); Rhonda Bodfield Sander, *Predator law to get high-court hearing*, Arizona Daily Star, Mar. 25, 2001, at A1 (Department of Corrections uses polygraph results in sexual predator program); Wire Reports, *500 at FBI to get lie-detector tests in security move to thwart spying*, Arizona Daily Star, Mar. 25, 2001, at A1 (FBI to screen employees with polygraph tests). When important decisions in industry and

government are made with the help of polygraph tests, it seems strange to refuse any use of such information to determine whether to impose a life or death sentence.

¶ 91 To perpetuate such a ban is to say that the leaders of government, law enforcement, and industry are all wrong in deciding what to consider in making important decisions. But polygraph testing techniques have improved to the point that we cannot realistically make that claim. There is no need here to make a detailed examination of the improvements in polygraph testing. The interested reader will find the subject well developed in the recent case of *United States v. Crumby*, 895 F.Supp. 1354 (D.Ariz.1995). I will do no more here than attempt to summarize District Judge Strand's thorough and thoughtful *Daubert* analysis [6]:

¶ 92 In *Crumby*, the accused sought to admit polygraph test results indicating he truthfully stated that he did not commit the crimes he was charged with. In addressing the question of admissibility and its limits, the trial judge listed some pragmatic reasons for abandoning the rule of per se inadmissibility, finding as follows: polygraphy has faced extensive scientific testing; numerous peer-reviewed scholarly articles have dealt with the reliability and validity of polygraph evidence; known error rates for polygraphy are remarkably low, accuracy being about ninety-five percent when used to show truthfulness; polygraph evidence has gained widespread acceptance; and, because the modern science of polygraphy has existed for about twenty-five years and has found use in business and law enforcement, polygraph expert testimony can be based on research unrelated to the litigation. Thus, polygraphy was reliable enough to admit for limited purposes. *See id.* at 1358–61.

¶ 93 Given these considerations, Judge Strand found that fears of polygraph evidence abuse do not apply when the defendant seeks to introduce such evidence for the limited purpose of bolstering his version of the

**6.** I am aware, of course, that this court does not follow *Daubert*. *See Logerquist v. McVey*, 196 Ariz. 470, 1 P.3d 113 (2000). I do not recommend that we retreat from that position. But evidence found reliable enough to be admitted under *Daubert* should certainly be admissible under a statute that permits receipt of any information and requires the judge to consider any factors in an offer to which the rules of evidence do not apply.

events to prove innocence. He also found that judicial resources will not be unduly consumed as courts become more familiar with the use of polygraph evidence and that there is little reason to deny a criminal defendant the use of highly probative evidence on such grounds. *Id.* at 1362. Finally, any "aura of infallibility" argument could not survive the common use of stipulated polygraph evidence, the value of vigorous cross-examination, and the protection provided by proper limiting instructions to the jury. *Id.*

¶ 94 Though the judge admitted the polygraph evidence, he was careful to limit its use. The defendant would not be permitted to testify to either the questions asked in the examination or his answers. If the polygrapher is qualified as an expert, and a foundation laid to meet Rule 608(a), Ariz.R.Evid. (evidence of truthful character admissible to support credibility of a witness whose credibility has been attacked), the polygrapher may give an opinion as to the truthful character of the defendant. Even then, the substance of the questions and their answers must not be published to the jury. Moreover, to properly admit polygraph evidence, the defendant must provide adequate notice to the government, and opposing parties must be given a reasonable opportunity to have their own examiners administer a materially similar test.

¶ 95 Thus, concluded Judge Strand, "[s]o long as the Defendant's credibility and his statements concerning his participation in the robbery are impeached, the polygraph evidence will be admissible" to support his version of the facts. *Id.* at 1364. If this type of testimony is admissible in a jury trial, we should not preclude a trial judge required to determine who shall live and who shall die from even considering it for whatever weight it may have in a particular case.

¶ 96 Given the great weight of the evidence in this case and Harrod's inability to explain any of the incriminating facts, I have no hesitation in agreeing with, much less deferring to, the trial judge's ruling that even if he had considered the polygraph results he would not have given them any weight or found any residual doubt. But I disagree with the proposition that polygraph results can never be considered at all.

## CONCLUSION

¶ 97 This court has an obligation to the entire system-victims, judges, prosecutors, defendants, and defense counsel-to set the sentencing standards to be followed in capital cases. The boundaries set by the constitution and A.R.S. § 13–703(C) require consideration of *any information* that is relevant or anything that may bear on mitigation. If residual doubt is not to be a mitigating circumstance and if polygraph results can play no part in determining residual doubt, the majority should say so. If the majority agrees with the position I have taken, it should say that. The worst course, I submit, is to avoid the issues, even though they have been raised, with the result that no one knows the rules. Games of chance are quite inappropriate to capital cases. The state is currently engaged in an effort to bring more certainty and predictability to capital cases, as well as to bring them to finality more quickly. We do nothing to help and much to hinder this effort by leaving the rules and standards in doubt. The trial judge in this case is one of our most experienced and, deservedly, most respected, and other judges will no doubt follow his lead. There is little consistency to be achieved when one trial judge feels free to consider residual doubt and polygraph results while another may not. It is time to articulate the rules.

CONCURRING: THOMAS A. ZLAKET, Chief Justice.